BURT RIGID BOX INC., f/k/a F.N. Burt Company, Inc., Plaintiff,

v.

TRAVELERS PROPERTY CASUALTY CORP., f/k/a Aetna Casualty and Surety Company, Defendant.

No. 91–CV–303F.

United States District Court, W.D. New York.

Jan. 26, 2001.

Lippes, Silverstein, Mathias & Wexler (Jonathan A. Mugel, of counsel), Buffalo, NY, for plaintiff.

Stroock & Stroock & Lavan, LLP (Robert Lewin, Michele L. Jacobson, of counsel), New York City, Walsh, Roberts & Grace (James R. Walsh, Thomas E. Roberts, of counsel), Buffalo, NY, for defendant.

## DECISION and ORDER

FOSCHIO, United States Magistrate Judge.

### JURISDICTION

On July 2, 1998, the parties to this action consented to proceed before the undersigned (Docket Item No. 123). The matter is currently before the court on Defendant's motion for partial summary judgment filed on July 1, 1998 (Docket Item No. 120), and Plaintiff's motion for summary judgment filed October 30, 1998 (Docket Item No. 135).

## BACKGROUND

Plaintiff commenced the above action on May 1, 1991, seeking declaratory relief that Defendant[1] is obligated to defend and indemnify Plaintiff for costs expected and incurred with regard to the clean-up of hazardous waste contamination found at four sites located in Western New York, as well as ten personal injury actions related to the contamination found at one of the sites. On June 4, 1991, Defendant filed its answer, asserting affirmative defenses. On June 24, 1991, Defendant filed an amended answer.

On August 25, 1995, Plaintiff moved to amend the Complaint. That request was granted on September 29, 1995 and, on October 4, 1995, Plaintiff filed an Amended Complaint (Docket Item No. 83). On March 6, 1996, Defendant filed an answer to the Amended Complaint (Docket Item No. 87).

Plaintiff, on February 26, 1998, moved for a protective order prohibiting Defendant from taking depositions of plaintiffs in the underlying state actions and for sanctions. (Docket Item No. 102). The undersigned denied that motion in a Decision and Order filed March 16, 1998 (Docket Item No. 109).

On May 6, 1998, Plaintiff moved for permission to file a second amended complaint. That request was granted by stipulation and order filed June 22, 1998. On June 26, 1998, Defendant filed an answer to the second amended complaint. (Docket Item No. 115).

On July 1, 1998, Plaintiff filed a motion for summary judgment (Docket Item No. 117), supported by the Affidavit of Jonathan A. Mugel, Esq. (Docket Item No. 118) with a Statement of Facts Believed to be Undisputed attached and accompanied by four volumes of exhibits, and a Memorandum of Law (Docket Item No. 119).

Also on July 1, 1998, Defendant filed a motion for partial summary judgment (Docket Item No. 120), attached to which are a Statement of Undisputed Facts, the Affidavit of Michele L. Jacobson, Esq. ("Jacobson Affidavit"), and Exhibits, and accompanied by a Memorandum of Law (Docket Item No. 121) ("Defendant's Memorandum in Support of Partial Summary Judgment"), and the Affidavit of Patricia H. Kelley (Docket Item No. 122) ("Kelley Affidavit"). On August 27, 1998, Plaintiff filed a Memorandum of Law in opposition to Defendant's motion for partial summary judgment (Docket Item No. 125) ("Plaintiff's Memorandum in Opposition to Partial Summary Judgment"), the Affidavit of W. Russell Hurd (Docket Item No. 126) ("Hurd Affidavit in Opposition to Partial Summary Judgment"), the Affidavit of Jonathan A. Mugel, Esq., in Opposition to Partial Summary Judgment (Docket Item No. 127) ("Mugel Affidavit in Opposition to Partial Summary Judgment"), and a Response to Defendant's Statement of Undisputed Facts (Docket Item No. 128).

On September 4, 1998, Defendant filed a Memorandum of Law in Opposition to Plaintiff's summary judgment motion (Docket Item No. 130), and a Response to Plaintiff's Statement of Facts Believed to be Undisputed (Docket Item No. 132). Also on September 4, 1998, Defendant filed a cross-motion to strike Mugel's affidavit submitted in support of Plaintiff's summary judgment motion, and the affidavit of Alec E. Milne, sworn to on October 30, 1992 and submitted in connection with Plaintiff's summary judgment motion (Docket Item No. 129). That motion was supported by a Memorandum of Law (Docket Item No. 131).

According to a Stipulation and Order filed October 2, 1998 (Docket Item No. 133), the parties agreed that Plaintiff would withdraw the Mugel Affidavit sub-

---

1. Other parties originally named as defendants in this action who have since been dismissed include Cigna Property & Casualty Company, Federal Insurance Company, Liberty Mutual Insurance Company, Hartford Accident & Indemnity Company and Lloyds of London.

mitted in support of Plaintiff's summary judgment motion and submit in its place affidavits which attempt to remedy the objections Defendant raised in its motion to strike. Other responding papers were also to be amended to refer to the replacement affidavits, and resubmitted.

On October 30, 1998, Plaintiff filed a new summary judgment motion (Docket Item No. 135). The motion was accompanied by a Memorandum of Law (Docket Item No. 136) ("Plaintiff's Memorandum"), the Affidavit of Jonathan A. Mugel ("Docket Item No. 137") ("Mugel Affidavit"), and the Affidavit of W. Russell Hurd (Docket Item No. 138) ("Hurd Affidavit").

By Stipulation and Order filed December 17, 1998 (Docket Item No. 141), the parties agreed that Plaintiff would submit a Supplemental Affidavit in support of its re-submitted motion for summary judgment and Defendant would resubmit a response to the motion. Accordingly, on December 18, 1998, Defendant filed a Memorandum of Law in Opposition to Plaintiff's re-filed summary judgment motion (Docket Item No. 142) ("Defendant's Memorandum in Opposition to Summary Judgment"), and a Response to Plaintiff's Re-filed Statement of Facts in Support of Summary Judgement (Docket Item No. 143).

On February 19, 1999, Plaintiff filed reply papers in further support of summary judgment, including a Reply Memorandum of Law (Docket Item No. 145) ("Plaintiff's Reply Memorandum"), and affidavits of several Burt employees. On February 19, 1999, Defendant also filed reply papers in further support of partial summary judgment, including a Reply Memorandum of Law (Docket Item No. .149) ("Defendant's Reply Memorandum"), a Response to Plaintiff's Resubmitted Statement of Undisputed Facts (Docket Item No. 150) ("Defendant's Response to Plaintiff's Statement of Undisputed Facts"), and a Supplemental Affidavit of Michele L. Jacobson, Esq. (Docket Item No. 151) ("Jacobson Reply Affidavit").

By letter filed January 4, 2001 (Docket Item No. 152), Plaintiff's counsel advised the court that pursuant to the parties stipulation filed October 2, 1998 (Docket Item No. 133), it was withdrawing its original summary judgment motion filed July 1, 1998 (Docket Item No. 117), along with the motion's supporting papers (Docket Items Nos. 118, 119 and four volumes of exhibits). Plaintiff's counsel also advised that Defendant's counsel had agreed to withdraw its papers filed on September 4, 1998 in response to Plaintiff's original summary judgment motion (Docket Items Nos. 130 and 132), as well as its cross-motion to strike filed September 4, 1998 (Docket Item No. 129), along with the memorandum of law in support of the motion (Docket Item No. 131).

Oral argument was deemed unnecessary.

Based on the following, the court finds that Burt is entitled to summary judgment finding Aetna issued to Moore comprehensive general liability policies which also covered Burt, including policy Nos. 01AL26334CM(Y), providing coverage for the period December 31, 1963 through December 31, 1965, 01AL042774CM(Y), providing coverage for the period December 31, 1965 through December 31, 1967, and 01AL143628CM(Y), providing coverage for the period December 31, 1967 through December 31, 1971. Burt is also entitled to summary judgment finding that Aetna has failed to establish policy No. 01AL143268CM(Y) was endorsed by a pollution exclusion. Aetna is entitled to summary judgment that it is not required to defend Burt with regard to the CERCLA actions relevant to the Pfohl Landfill or the Sleepy Hollow site, or the *Cline I* property damage action as Burt failed to timely notify Aetna as to the relevant occurrences and claims, thereby failing to meet a condition precedent to suit. Aetna is, however, required to defend Burt with regard to the CERCLA actions relevant to the Alltift Landfill and the Booth Oil Site,

as well as all the private personal injury and property damage actions except *Cline I*. Aetna is not required to indemnify Burt as to any claim outside the coverage of the policies, including the loss of consortium claims asserted in the *Ewert, Spink* and *Weigel* actions, or to *Ewert* plaintiff Rosemary Spork or *Cline II* plaintiff Wagner, nor must Aetna provide a defense as to those claims. Finally, in the absence of any controlling precedent supporting Aetna's request for apportionment of defense costs, the court will not order that defense costs ultimately be apportioned between Burt and Aetna as to claims that are ultimately found to be outside the coverage period or insurance policies.

### FACTS

Plaintiff Burt Rigid Box, Inc., f/k/a F.N. Burt Company, Inc. ("Burt"), is a corporation organized under the laws of Delaware with its principal office located in Cheektowaga, New York. Burt maintains that from 1908 to 1983, it was owned by and insured through Moore Corporation Limited of Canada ("Moore"). Defendant, Travelers Property Casualty Corp., f/k/a Aetna Casualty and Surety Company ("Aetna"), is an insurance company which allegedly issued primary and excess comprehensive general liability insurance coverage to Burt as an additional insured under policies issued to Moore covering the period December 31, 1963 through December 31, 1971. The Complaint seeks a determination of Aetna's obligation to defend and indemnify Burt with respect to suits by the State of New York and the United States of America, arising out of Plaintiff's alleged responsibility as a generator for chemical waste contamination and property damage allegedly resulting therefrom as a result of hazardous waste disposed of between December 31, 1963 and December 31, 1971 at several sites in or near Buffalo, including the Pfohl Brothers Landfill ("the Pfohl Landfill"), the Booth Oil Landfill ("the Booth Oil site"), the Sleepy Hollow Campground ("the Sleepy Hollow site"), and the Alltift Realty Landfill ("the Alltift

Landfill"), as well as to personal injury suits related to the contamination found at the Pfohl Landfill filed by persons who lived, worked or recreated near that site. It is undisputed that neither Burt nor Aetna has been able to locate any of the relevant insurance policies Aetna allegedly issued to Moore covering Burt as an additional insured as a Moore subsidiary and on which Burt's claims that Aetna must provide both a defense to the underlying legal actions and indemnification.

### *The Underlying Claims*

In a letter dated March 20, 1985, the New York State Department of Environmental Conservation ("DEC") informed Burt that it had been identified as a generator of hazardous wastes deposited at the Pfohl Landfill. Hurd Affidavit, Exhibit 1. The DEC's March 20, 1985 letter ("the March 20, 1985 DEC letter") specifically advised

> The Division of Environmental Enforcement of the New York State Department of Environmental Conservation is evaluating certain inactive hazardous waste disposal sites within the State which have been identified and listed in the registry of such sites prepared by the Department. Among the sites assigned to this Division is the Pfohl Brothers Landfill, Site # 915043, located in the Town of Cheektowaga, Erie County. Existing information indicates that this site was used for the disposal of wastes. Your company has been identified as a generator of wastes disposed of at this site.

*Id.*

The DEC also requested Burt provide certain information relevant to Burt's activities regarding the Pfohl Landfill to assist the DEC's investigation although no explicit legal claims were asserted against Burt at that time. *Id.*

Burt was notified by the DEC in a letter dated March 14, 1986 that it was considered the generator of hazardous waste ma-

terials discovered in 18 drums which had been transported to the Sleepy Hollow site where they was deposited. Hurd Affidavit, Exhibit 18. Specifically, Burt was advised

> The investigation reveals that the waste materials in question were generated by the F.N. Burt Company and hauled and disposed of by the trucking concern known as Feitzhans and Maurer. The current landowners of the site upon which they sit are the Latello Brothers. Please be advised that under New York State inactive hazardous waste site law all three parties herein i.e. the generator, hauler (and former owner), and current owner are jointly and severally liable for this site.

*Id.*

As such, Burt was considered a responsible party regarding the Sleepy Hollow site. *Id.* In a consent order dated February 3, 1987, Burt agreed to undertake a clean-up of the Sleepy Hollow site. Hurd Affidavit, Exhibit 19.

In a letter dated September 18, 1987, the DEC requested additional information regarding Aetna's involvement with the hazardous waste dumped in the Pfohl Landfill. Hurd Affidavit, Exhibit 2.

By letter dated February 17, 1988, the DEC advised Burt that it had been identified as a potentially responsible party ("a PRP"), as a generator of hazardous waste disposed of at the Alltift Realty Landfill site ("the Alltift Landfill"), and, as such, the DEC asserted a claim against Burt for the cost of investigating and remediating the Landfill. Hurd Affidavit, Exhibit 12. In a similar letter dated February 19, 1988, the DEC advised Burt that it had been identified as a generator of hazardous waste disposed of at the Booth Oil site, that Burt was considered a PRP with respect to the Booth Oil site, and that it was asserting claims against Burt for the costs of investigating and remediating the Booth Oil site. Hurd Affidavit, Exhibit 15. By letter dated March 31, 1988, the DEC informed Burt that it was considered a

PRP with respect to the Pfohl Landfill. Hurd Affidavit, Exhibit 3.

By letters dated May 6 and 10, 1988, Burt notified Aetna of the DEC's claims against it with regard to the Pfohl Landfill, the Alltift Landfill and the Booth Oil site. Hurd Affidavit, Exhibits 4 and 5. In another letter dated June 16, 1988, Burt advised Aetna that it was incurring defense costs as the DEC was pressuring the PRPs, including Burt, to expend funds for remedial investigation of the Pfohl and Alltift Landfills and the Booth Oil site. Hurd Affidavit, Exhibit 6. Aetna responded in a letter dated October 18, 1988 that as no relevant insurance policy could be located, Aetna would provide no coverage concerning the claim. Hurd Affidavit, Exhibit 7.

In a letter to Burt dated October 19, 1988 concerning the Pfohl Landfill, the Alltift Landfill and the Booth Oil site, Aetna advised that it had been unable to verify that the general liability insurance policies Burt identified as having been issued to Moore also provided general liability insurance to Burt. *Id*, Exhibit 7. By letter dated May 11, 1989, Aetna again advised that based on Burt's inability to produce documentation demonstrating that Aetna had provided insurance coverage to Burt, Aetna had taken the position that no such insurance coverage had ever been provided. Hurd Affidavit, Exhibit 7.

Burt wrote Aetna on December 27, 1990 and February 15, 1991 notifying Aetna of the DEC's claim against Burt regarding the Sleepy Hollow site and requesting Aetna provide a defense and indemnify Burt as to the claim. Hurd Affidavit, Exhibits 20 and 21. Aetna denied coverage regarding the Sleepy Hollow site by letter dated January 16, 1991. Mugel Affidavit in Opposition to. Partial Summary Judgment, Exhibit 28.

The DEC, in a letter dated April 2, 1992, notified Burt that it intended to seek recovery from Burt for expenses incurred conducting remediation activities at the Pfohl Landfill. Hurd Affidavit, Exhibit 10.

On April 22, 1992, Burt notified Aetna of the DEC's April 2, 1992 claims, however, Aetna refused to provide coverage as to those claims. Hurd Affidavit, Exhibit 11.

By letters of February 12 and April 23, 1993, the DEC advised that, based on its investigation, it considered Burt to be a responsible party with regard to contamination at the Booth Oil site, and asserted a claim against Burt for remediation of the site and reimbursement of expenses incurred by the DEC regarding the site. Hurd Affidavit, Exhibits 16 and 17.

In a letter dated November 13, 1995, the DEC notified Burt that it was considered a responsible party as a generator of hazardous wastes at the Alltift Realty Landfill site ("the Alltift Landfill"). Hurd Affidavit, Exhibit 13. In particular, the DEC advised, "[t]he purpose of this Notice Letter is to inform you of your potential liability as a responsible party, and to determine whether you are willing to conduct or finance the remedial program for this site." *Id.* The DEC also asserted a claim against Burt for "payment of all monies DEC has or may expend for the investigation and remediation of this [Alltift Landfill] site, plus any and all interest ... accru[ing] as of the date of this letter." *Id.* By letter dated December 1, 1995, Burt notified Aetna of the DEC's claims asserted against Burt with regard to the Alltift Landfill, and requested Aetna provide both a defense to such claims as well as indemnification. Hurd Affidavit, Exhibit 14.

Subsequent to commencing this declaratory judgment action, Burt has been sued in litigation relating to the hazardous waste it generated which was deposited into the Pfohl Landfill. Such litigation includes actions for recovery of costs, contribution and declaratory relief under §§ 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and 9613, and personal injury actions filed in both state and federal court. Specifically, Burt is sued as a defendant in property damage actions entitled *Cline v. Occidental Chemical Corp. (Cline I )*, *Pfohl v. Amax, Inc. ("Pfohl")*, *Freier v. Amax,*

*Inc. ("Freier")*, *Bartlebaugh v. Amax, Inc., ("Bartlebaugh")*, and *Marzec v. Amax, Inc. ("Marzec")* ("the property damage actions"). In these actions, numerous plaintiffs allege that between 1932 and 1971 Burt, and others, generated hazardous waste that was disposed of in the Pfohl Landfill and to which the plaintiffs, who owned and resided at properties in the vicinity of the Pfohl Landfill, were exposed, diminishing the value of such property and the plaintiffs' quality of life.

Burt notified Aetna of the claims asserted against it in the above actions, requesting Aetna defend and indemnify Burt with regard to the claims on May 24, 1994 (*Cline I* ) (Hurd Affidavit, Exhibit 23), May 19, 1994 (*Pfohl* ) (Hurd Affidavit, Exhibit 26), September 27, 1994 (*Freier* ) (Hurd Affidavit, Exhibit 28), May 8, 1995 (*Bartlebaugh* ) (Hurd Affidavit, Exhibit 34), and September 11, 1995 (*Marzec* ) (Hurd Affidavit, Exhibit 40). Aetna, however, refused to provide any defense or indemnification with regard to the property damage claims on the basis that it was unable to verify that Burt was an insured under the alleged policies. Hurd Affidavit Exhibits 24 (June 21, 1994, regarding *Cline I* and *Pfohl* ), 29 (October 20, 1994, regarding *Freier* ), 35 (May 23, 1995, regarding *Bartlebaugh* ), and 41 (October 11, 1995, regarding *Marzec* ).

Burt is also named as a defendant in four personal injury actions entitled *Ewert v. Westinghouse Electric Corporation ("Ewert")*, *Cline v. Westinghouse Electric Corporation ("Cline II ")*, *Spink v. Westinghouse Electric Corporation ("Spink")*, and *Weigel v. Westinghouse Electric Corporation ("Weigel")* ("the personal injury actions"). In these actions, numerous plaintiffs assert personal injury and wrongful death claims they attribute to exposure to hazardous waste generated by Burt and others and deposited into the Landfill during the 1950s and 1960s. According to those plaintiffs, such exposure occurred while they lived, worked and recreated in the vicinity of the Pfohl Land-

fill. Burt notified Aetna of the personal injury claims, requesting Aetna provide both a defense and indemnification, on April 26, 1995 (*Ewert*, Hurd Affidavit, Exhibit 31), June 27, 1995 (*Cline II*, Hurd Affidavit, Exhibit 37), January 28, 1997 (*Spink*, Hurd Affidavit, Exhibit 43), and November 21, 1997 (*Weigel*, Hurd Affidavit, Exhibit 46). Aetna also refused to provide any defense or indemnification with regard to the personal injury actions on the basis that it was unable to verify that Burt was an insured under the alleged policies. Hurd Affidavit Exhibits 32 (May 10, 1995, regarding *Ewert* ), 38 (August 7, 1995, regarding *Cline II* ), 44 (March 20, 1997, regarding *Spink* ), and 47 (January 12, 1998, regarding *Weigel* ).

### The Insurance Policies

The parties dispute whether Aetna issued any insurance policies providing coverage to Burt during the relevant period, *i.e.*, December 31, 1963 through December 31, 1971. It is, however, undisputed that prior to 1983 Burt was a wholly-owned subsidiary of Moore Corporation Limited ("Moore"), which maintains its headquarters in Toronto, Ontario, Canada. Mugel Affidavit, Exhibit 20, p. 5, and Exhibit 21. According to Burt, Aetna issued comprehensive general liability ("CGL") policies to Moore covering the period December 31, 1963 to December 31, 1971, naming Burt as an insured for each of those years. Second Amended Complaint, ¶¶ 4–5. Burt, however, asserts it never received any of the actual policies issued by Aetna to Moore or copies of the policies. Mugel Affidavit, Exhibit 54, pp. 39–40, and Exhibit 56, p. 13.

Burt maintains that upon being advised of the DEC's investigation into the Pfohl Landfill, Burt conducted a search to locate any applicable insurance policies. Mugel Affidavit, Exhibit 51, p. 29. Burt attributes the fact that none were ever found to Moore's practice not to provide its subsidiaries with copies of the insurance policies Moore maintained on their behalf. Mugel Affidavit, Exhibit 56, p. 13. Aetna was also unable to produce the policies, having destroyed all underwriting records and policies for the period December 31, 1963 through December 31, 1971 in accordance with its records retention and destruction program. Mugel Affidavit, Exhibit 24, ¶ 6. As such, Aetna refused to provide coverage to Burt. Hurd Affidavit, Exhibit 7, p. 3, ¶¶ 6 and 7.

Moore located copies of CGL policies issued to Moore for the years 1972 through 1983 by other insurance companies, but was unable to locate any copies of CGL policies issued by Aetna to Moore for the period December 31, 1963 through December 31, 1971 or prior thereto. Mugel Affidavit, Exhibit 51, p. 30. In May 1988, however, Moore eventually located information which referred to several Aetna policies issued to Moore, including policy numbers, dates and type of coverage, as follows:

| Policy Number | Dates of Coverage | Type of Coverage |
|---|---|---|
| 01AL26334CM(Y) | 12/31/63–12/31/65 | CGL |
| 01AL042774CM(Y) | 12/31/65–12/31/67 | CGL |
| 01AL143628CM(Y) | 12/31/67–12/31/69 | CGL |
| 01AL143622CM(Y) | 12/31/69–12/31/70 | CGL |
| 01AL143628CM(Y) | 12/31/70–12/31/71 | CGL |

Mugel Affidavit, Exhibit 22.

Burt maintains that upon receiving the above information from Moore, Burt notified Aetna in May 1988 of the DEC's claims against Burt pertaining to the Pfohl and Alltift Landfills and the Booth Oil site. Hurd Affidavit, Exhibits 4 and 5.

Aetna nevertheless continued to refuse to provide coverage based on that information, causing Burt to search for copies of the policies from third parties including Moore's insurance broker, as well as secondary evidence of the policies, *i.e.*, evidence other than the original disputed policies or copies thereof. Burt maintains that secondary evidence establishes that for the period December 31, 1963 through December 31, 1971, Burt was insured by Aetna under comprehensive liability policies issued to Moore and which obligate Aetna to provide Burt with indemnification and a defense to the underlying actions.

Plaintiff's Memorandum at 13–15 (referencing Appendix A to Plaintiff's Memorandum entitled "Summary of Secondary Evidence of Aetna Policies at Issue").

In contrast, Aetna maintains that Burt has failed to establish the existence of the claimed insurance policies and, alternatively, asserts that Burt failed to satisfy the condition precedent to coverage of timely notification of occurrences and claims, and that many of the claims asserted in the private party personal injury and property damage claims are either outside alleged coverage period or barred by exclusions in the policies themselves.

Burt does not dispute that the standard Aetna CGL insurance policies issued during the years 1963 through 1971, the period during which Burt maintains it was insured through insurance policies issued by Aetna to Moore, required, as a condition precedent to coverage sought for an "accident" or "occurrence," that the insured notify Aetna in writing of an accident or occurrence "as soon as practicable." Kelley Affidavit, Exs. A at 4 and B at 15; Mugel Affidavit, Exs. 59 at 4 and 61 at 15.

Standard CGL policies commonly issued by Aetna during the period 1955 through 1965 provide "[t]his policy applies only to accidents which occur during the policy period within the United States of America, its territories or possessions, or Canada." Kelley Affidavit, Ex. A at 2; Mugel Affidavit, Ex. 59 at 2. Similarly, standard CGL policies commonly issued by Aetna during the period 1966 through 1971 provide "[t]his insurance applies only to bodily injury or property damage which occurs during the period within the policy territory." Kelley Affidavit, Ex. B at 7; Mugel Affidavit, Ex. 61 at 7. "Occurrence" is defined in the latter policy as

> an accident, including injurious exposure to conditions, which results during the policy period, in bodily injury or property damage, neither expected nor intended from the standpoint of the insured.

Kelley Affidavit, Ex. B at 13; Mugel Affidavit, Ex. 61 at 13.

Aetna maintains that, as of June 1970, Aetna typically endorsed its standard policy to contain a pollution exclusion which modified, *inter alia*, CGL insurance policies. Kelley Affidavit, ¶ 4. The pollution exclusion provides

> It is agreed that the insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere, or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

Kelley Affidavit, Ex. C.

The pollution exclusion further indicates that it is "effective on the inception date of the policy unless otherwise stated herein." *Id.*

## DISCUSSION

### 1. *Summary Judgment*

Burt and Aetna have each moved for summary judgment declaring Aetna's obligations under the alleged relevant insurance policies to defend and indemnify Burt with respect to the CERCLA actions and the private property damage and personal injury actions. Summary judgment of a claim or defense will be granted when the moving party demonstrates that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett,* 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). The moving party for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material

fact. If there is any evidence in the record based upon any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party cannot obtain a summary judgment. *Celotex, supra,* at 331, 106 S.Ct. 2548.

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no issue as to any material fact, and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson, supra,* at 247–48, 106 S.Ct. 2505. Whether a fact is material depends on the substantive law of the claim and "[o]nly disputes over facts, that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. 2505.

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corporation v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56). Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the non-moving party's case." *Nora Beverages, Inc. v.*

*Perrier Group of America, Inc.,* 164 F.3d 736, 742 (2d Cir.1998).

Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995). In opposing a motion for summary judgment a party "may not simply rely on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Goenaga, supra,* at 18 (citing cases). Further, where the burden of proof on an issue for which summary judgment is sought is on the movant, should the movant fail to meet its initial burden of establishing the absence of any genuine issue of material fact as to that issue, the non-movant will prevail even if the non-movant submits no evidentiary matter establishing there is indeed a genuine issue for trial. *Zanghi v. Incorporated Village of Old Brookville,* 752 F.2d 42, 47 (2d Cir.1985).

■ A district court sitting in diversity applies the substantive law of the forum state. *Klaxon v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Thrift Drug, Inc. v. Universal Prescription Administrators,* 131 F.3d 95, 97 (2d Cir.1997). Here, the parties do not dispute that the law of New York, the forum state, applies.

The instant motions concern whether Aetna is obligated to defend or indemnify Burt with regard to the underlying actions. This determination turns on whether Aetna ever issued insurance policies covering Burt for the period December 31, 1963 through December 31, 1971, whether, assuming policies covering Burt were issued, Burt's notifications to Aetna of the underlying occurrences and claims were timely, whether Aetna waived untimely notification as a defense based on untimely disclaimer of coverage or defense, and

whether any of the claims asserted in the underlying actions are outside the coverage of any insurance policies issued by Aetna.

▌ Whether an insurer has an obligation to defend is a question of law for the courts. *Freedom Gravel Products, Inc. v. Michigan Mutual Insurance Company*, 819 F.Supp. 275, 279 (W.D.N.Y. 1993) (citing *National Grange Mutual Insurance Company v. Continental Casualty Insurance Company*, 650 F.Supp. 1404, 1408 (S.D.N.Y.1986), and *Seaboard Surety Company v. Gillette Company*, 64 N.Y.2d 304, 486 N.Y.S.2d 873, 476 N.E.2d 272, 275 (1984)). Where the original insurance policy cannot be found, its existence may be found, as a matter of law, based on secondary evidence establishing the policy was issued. *See Colonial Tanning Corporation v. Home Indemnity Company*, 780 F.Supp. 906, 922 (N.D.N.Y.1991) (allowing plaintiff to demonstrate on summary judgment existence of lost insurance policy through secondary evidence); *Burroughs Wellcome Company v. Commercial Union Insurance Company*, 632 F.Supp. 1213, 1222 (S.D.N.Y.1986) (same).

▌ An insurer's duty to defend is derived from the allegations of the complaint and the terms of the policy. *Technicon Electronics Corporation v. American Home Assurance Company*, 74 N.Y.2d 66, 544 N.Y.S.2d 531, 542 N.E.2d 1048, 1050 (1989). "The duty of an insurer to defend its insured arises whenever the allegations within the four corners of the underlying complaint potentially give rise to a covered claim, or where the insurer 'has actual knowledge of facts establishing a reasonable possibility of coverage.'" *Frontier Insulation Contractors, Inc. v. Merchants Mutual Insurance Company*, 91 N.Y.2d 169, 667 N.Y.S.2d 982, 690 N.E.2d 866, 868 (1997) (quoting *Fitzpatrick v. American Honda Motor Company, Inc.*, 78 N.Y.2d 61, 571 N.Y.S.2d 672, 575 N.E.2d 90, 90 (1991)).

▌ There is, however, no duty to defend if the insurer shows that the allegations in the complaint are completely within a policy exclusion and the allegations, taken as a whole, are subject to no other interpretation. *Technicon Electronics Corp., supra*, at 1050 (citing *International Paper Company v. Continental Casualty Company*, 35 N.Y.2d 322, 361 N.Y.S.2d 873, 320 N.E.2d 619, 620 (1974)). Further, the insurer bears the burden of establishing that exclusions or exemptions from coverage apply in a particular case. *Seaboard Surety Co., supra*, at 275.

▌ An insurer's duty to defend is broader than the duty to indemnify. *EAD Metallurgical Incorporated v. Aetna Casualty & Surety Company*, 905 F.2d 8, 11 (2d Cir.1990). Provided it is determined that the insurer is obligated to indemnify, no separate analysis of the insurer's duty to defend is necessary. *Id.*

### 2. *Existence of the Policies*

As stated, the parties dispute whether Aetna ever issued any insurance policies covering Burt for the time period December 31, 1963 through December 31, 1971. In particular, neither Burt nor Aetna has been able to locate any Aetna insurance policies providing Burt with the claimed coverage. Rather, Aetna maintains any such policies would have been destroyed in accordance with its document retention and destruction policy in effect prior to receipt from Burt of notification of the DEC's claims against it. Burt maintains that although it was a named insured on CGL policies issued to Moore, it was not Moore's practice to provide Burt with copies of those policies and that Moore also has destroyed all insurance policies issued between 1963 and 1972. As such, Burt attempts to establish the existence of such policies through secondary evidence.

The court's determination as to whether to grant summary judgment on the issue of the existence of the claimed insurance policies requires three separate determinations. First, the court must determine

what substantive evidentiary standard must guide its determination of whether the factual dispute over the existence of the claimed policies requires submission to the jury. Second, the court must determine whether Burt has sufficiently demonstrated that it has been unable to locate the claimed policies, despite diligent searching and inquiry, thereby allowing Burt to attempt to establish the existence of the policies by secondary evidence. Provided Burt satisfactorily demonstrates the requisite diligent searching and inquiry, the court will then analyze the evidence submitted by both parties to determine whether summary judgment may be granted in favor of either Burt or Aetna.

### A. *Standard of Proof*

"[S]ummary judgment should be granted where the evidence is such that it 'would require a directed verdict for the moving party.'" *Anderson, supra,* at 251, 106 S.Ct. 2505 (quoting *Sartor v. Arkansas Natural Gas Corporation,* 321 U.S. 620, 624, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). As such, "the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson, supra,* at 252, 106 S.Ct. 2505. Put another way, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Id.* at 252, 106 S.Ct. 2505.

> Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden. This conclusion is mandated by the nature of this determination. The question here is whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of the evidence required by the governing law or that he did not. Whether a jury could reasonably find for either party,

> however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant: It makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards.

*Anderson, supra,* at 254–55, 106 S.Ct. 2505.

The parties do not dispute that the burden is on the insured to prove the existence of an insurance policy under which coverage is sought. *See* Plaintiff's Memorandum at 18; Defendant's Memorandum in Opposition to Summary Judgment at 4. Aetna, however, argues that Burt must prove the existence of the alleged insurance policies by clear and convincing evidence, rather than by a preponderance of the evidence. Defendant's Memorandum in Opposition to Summary Judgment at 9–14. Burt argues in opposition that under New York law, it is required to establish the existence, terms and conditions of the Aetna policies by a preponderance of the evidence. Plaintiff's Reply Memorandum at 10–11.

The court's research reveals that in the only New York case addressing the standard of proof necessary to establish the existence of insurance policies by secondary evidence where the actual policy cannot be found, the court rejected use of the clear and convincing standard and held that the proponent of a lost policy must prove its existence and terms by a preponderance of the evidence. *Gold Fields American Corporation v. Aetna Casualty and Surety Company,* 173 Misc.2d 901, 661 N.Y.S.2d 948, 949–51 (1997). No higher New York court nor the Second Circuit has addressed this issue. *See Employers Ins. of Wausau v. Duplan Corporation,* 1999 WL 777976, *23 (S.D.N.Y.1999) (observing that *Gold Fields American, supra,*

is the only reported New York case to consider the standard of proof for establishing the existence of a lost insurance policy, and applying the preponderance of the evidence standard).

■ "[W]hile the decrees of 'lower state courts' should be 'attributed some weight ... the decision [is] not controlling ...' where the highest court of the State has not spoken on the point." *C.I.R. v. Bosch's Estate,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967) (quoting *King v. Order of United Commercial Travelers of America,* 333 U.S. 153, 160–61, 68 S.Ct. 488, 92 L.Ed. 608 (1948)). Federal courts are not necessarily bound by an intermediate state appellate court ruling; as such it follows "that when the application of a federal statute is involved, the decision of a state trial court as to an underlying issue of state law should *a fortiori* not be controlling." *Bosch, supra,* at 465, 87 S.Ct. 1776 (citing *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). Rather, "[w]here the law of a state is uncertain or ambiguous, [the court] will carefully predict how the highest court of the state would resolve the uncertainty or ambiguity." *Bank of New York v. Amoco Oil Company,* 35 F.3d 643, 650 (2d Cir. 1994). Nevertheless, in making such a determination, the best indicators of how the state's highest court would decide the issue are decisions of lower state courts. *Elliott Associates, L.P. v. Banco de la Nacion,* 194 F.3d 363, 370 (2d Cir.1999) (citing *In re Brooklyn Navy Yard Asbestos Litigation,* 971 F.2d 831, 850 (2d Cir. 1992)).

In *Gold Fields American, supra,* the court distinguished its finding that New York law requires the proponent of a lost instrument, such as an insurance policy, prove the instrument's existence by a preponderance of the evidence from other cases holding the applicable standard is clear and convincing evidence. *Gold Fields American, supra,* at 949–50. In particular, the court observed that in *Emons Industries, Inc. v. Liberty Mutual*

*Fire Insurance Company,* 545 F.Supp. 185 (S.D.N.Y.1982), the court, relying on a case from the District Court of the District of Columbia, held that in an insurance contract action applying New York law, it is the plaintiff's burden of proof to establish the existence of the relevant policy, but did not quantify the requisite burden of proof. The court also observed that in *Boyce Thompson Institute for Plant Research, Inc. v. Insurance Company of North America,* 751 F.Supp. 1137 (S.D.N.Y.1990), where the court held that the plaintiff in an insurance contract action under New York law was required to establish the existence of such contract by a preponderance of the evidence, relied on *Emons, supra,* in which, as just explained, the standard of proof is not discussed, as well as *Sadow v. Poskin Realty Corp.,* 63 Misc.2d 499, 312 N.Y.S.2d 901 (1970). At issue in *Sadow, supra,* however, was not a lost insurance policy but, rather, the standard of proof to establish the existence of a lost mortgage.

Significantly, in *Gold Fields American, supra,* the court distinguished *Sadow* on the basis that application of the higher standard of proof was justified in establishing the existence of lost and unrecorded deeds, mortgages and liens, in light of the fact that such documents are subject to the statute of frauds. The court observed that the New York "Court of Appeals has been reluctant to extend the clear and convincing standard to new categories of claims, so long as they involve more than mere property interests or concern exceptional civil matters." *Gold Fields American, supra,* at 904, 661 N.Y.S.2d 948 (internal citations omitted). The court also considered that the insurer's "knowledge that its liability on [CGL] policies might well extend for many years beyond the end of the policy period," creates a policy issue conflict as "the higher standard [of proof] would only serve to encourage carriers to destroy the policies as soon as possible in the hope that those who had paid for insurance would be un-

able to produce the policies after a substantial time period." *Id.* at 904–905. As such, the court concluded there was "nothing unfair in holding the plaintiff to the usual preponderance of the evidence standard of persuasion where the carrier, which is in the business of selling policies, chooses to keep no records of those policies." *Id.* at 905.

■ The reasoning set forth in *Gold Fields American, supra,* is persuasive. As such, the court's determination of whether there is a genuine issue of fact regarding the existence of the insurance policies and requiring submission to the jury must be guided by whether the evidence in the record supports a reasonable jury finding that Burt either has or has not demonstrated that Aetna issued the claimed insurance policies by a preponderance of the evidence, the standard of proof ordinarily applicable in civil matters. *Anderson, supra,* at 255–56, 106 S.Ct. 2505.

### B. *Diligent Search and Inquiring for Missing Insuring Documents*

■ The Second Circuit has held, and the parties do not dispute, that the insured bears the responsibility of keeping track of which insurance carriers have provided it with liability insurance. *Olin Corporation v. Insurance Company of North America,* 966 F.2d 718, 725 (2d Cir.1992). To meet its standard of proof, the insured need not produce the policy itself; rather, the policy's existence may be proven by secondary evidence. *Colonial Tanning Corp. v. Home Indemnity Co.,* 780 F.Supp. 906, 922 (N.D.N.Y.1991); *Burroughs Wellcome Co., supra,* at 1223; *Gold Fields American, supra,* at 949. Secondary evidence, however, may only be relied on where the insured demonstrates that it has made a "diligent but unsuccessful search and inquiry for the missing documents." *Burroughs Wellcome, supra,* at 1223 (citing J. WEINSTEIN & M. BERGER, 5 WEINSTEIN'S EVIDENCE, ¶ 1004(1)[05] at 1004–18 (1983)). The diligent search and inquiry requirement derives from Fed.R.Evid.

1004 which provides that secondary evidence of the contents of a writing, recording or photograph is admissible if "[all] originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith." The contents of a document may thus be established by secondary evidence only where "the failure to produce the original is satisfactorily explained." Fed.R.Evid. 1004 advisory committee's note. *See Schozer v. William Penn Life Insurance Company of New York,* 84 N.Y.2d 639, 620 N.Y.S.2d 797, 644 N.E.2d 1353, 1355 (1994) ("Under a long-recognized exception to the best evidence rule, secondary evidence of the contents of an unproduced original may be admitted upon threshold factual findings by the trial court that the proponent of the substitute has sufficiently explained the unavailability of the primary evidence, and has not procured its loss or destruction in bad faith.") (internal citations omitted). Further, "[l]oss may be established upon a showing of a diligent search in the location where the document was last known to have been kept, and through the testimony of the person who last had custody of the original." *Schozer, supra.*

In the instant case, the parties dispute whether Burt's search for the missing documents was sufficiently diligent to permit Burt to rely on secondary evidence to establish the existence of the insurance policies. Plaintiff's Memorandum at 19–22; Defendant's Memorandum in Opposition to Summary Judgment at 4–9; Plaintiff's Reply Memorandum at 3–9. In particular, Aetna maintains that Burt failed to demonstrate it attempted to search its own premises for the missing documentation. Defendant's Memorandum in Opposition to Summary Judgment at 6–7. Moreover, Aetna asserts that the material Burt submitted in connection with its summary judgment motion suggests that Burt did not commence its search for the insurance policies until 1988, more than three years after its receipt of the DEC's letter of March 20, 1985. *Id.* at 7. Further, Burt

waited until 1991 before requesting Marsh and McLennan, its insurance broker, search its records for the alleged policies or secondary evidence thereof. *Id.* at 8.

In reply, Burt submitted affidavits of Richard L. Ward, former Vice–President, Comptroller and Assistant Secretary of Burt (Docket Item No. 146) ("Ward Reply Affidavit"), Allene Brunea, former Burt employee responsible for maintaining custody and control over Burt's financial and other important documents maintained in Burt's safe at its premises at 2345 Walden Avenue, Cheektowaga, New York (Docket Item No. 147) ("Brunea Reply Affidavit"), and W. Russell Hurd, President and Chief Operating Officer of Burt (Docket Item No. 148) ("Hurd Reply Affidavit"). Hurd asserts that in April 1983, he and Taylor Kew and C. Victor Raiser, both of whom are now deceased, purchased Burt from Moore. Hurd Reply Affidavit, ¶¶ 2–3. Hurd served as Executive Vice President of Burt from April 13, 1983 until August 31, 1992, when Hurd became President and Chief Operating Officer of Burt. *Id.*, ¶ 1. According to Hurd, upon being notified by the Pfohl Brothers Site Steering Committee in 1986 that the DEC had identified Burt as a PRP with regard to the Pfohl Landfill, Hurd asked certain Burt employees to locate any insurance policies which might provide coverage to Burt as to the Pfohl Landfill claim. *Id.*, ¶¶ 4–5. Hurd was advised by such employees that Moore had not provided Burt with any insurance policies, but that policies issued directly to Burt by another insurance company in 1983 and thereafter were located. *Id.*, ¶ 6. Burt then, through its attorneys, requested that counsel for its former corporate parent, *i.e.*, Moore, provide information concerning insurance carriers who may have provided coverage to Burt as a Moore subsidiary, prior to 1983, so that Burt could notify such insurers of the potential claim. *Id.*, ¶ 7.

Ward worked at Burt first as an accountant in 1958, then as Data Processing Manager in charge of data processing and payroll beginning in 1968 until 1973 when he was promoted to Comptroller and Assistance Secretary, a position he held until 1989 when he became Burt's Vice President, Comptroller and Assistant Secretary. Ward Reply Affidavit, ¶ 2. Ward, who held his Vice President position until he retired in July 1996, maintains that Burt's then Executive Vice President had inquired of Ward whether Moore had ever provided Burt With insurance policies or copies. Ward Reply Affidavit, ¶¶ 2–3.

Brunea states that between June 12, 1978 and July 28, 1997 she was employed by Burt where she was responsible for maintaining custody and control over many of Burt's financial and other important documentation in Burt's safe located at its premises at 2345 Walden Avenue, Cheektowaga, New York. Brunea Reply Affidavit, ¶¶ 1, 4. Brunea maintains that "to the best of [her] knowledge, at no time between June 12, 1978 and April, 1983, or thereafter, were any insurance policies, or copies thereof, provided by Moore to Burt." *Id.*, ¶ 5. According to Brunea, in 1986 Hurd requested Burt's employees search the Burt premises for any insurance policies or copies of policies, issued to Moore which provided coverage to Burt. *Id.*, ¶ 6. The search, however, revealed only insurance policies issued in 1983 and thereafter, and Brunea advised Hurd that no insurance policies issued to Moore were located. *Id.*, ¶¶ 7–8.

Burt's recitation of its attempt to locate the missing insurance policies begins with Burt's assertion that in August 1986, upon being identified by the Pfohl Brothers Site Steering Committee as a PRP with regard to the Pfohl Landfill, Burt's current president, W. Russell Hurd, asked certain Burt employees to search for any insurance policies that might provide coverage to Burt. Plaintiff's Reply Memorandum at 4 (citing Hurd Reply Affidavit (Docket Item No. 148), ¶ 2–5). Upon being advised that no such policies had been located, Burt, through its attorneys, requested that counsel for Moore, its former parent corporation, provide it with information pertaining

to insurance carriers who may have provided coverage to Burt, as a subsidiary to Moore, prior to 1983 so that Burt could notify the appropriate insurers. Hurd Affidavit in Opposition to Partial Summary Judgment, ¶ 15 and Exhibit M; Hurd Reply Affidavit, ¶¶ 6–7. Moore, however, was also unable to locate any policies. In letters dated September 22 and 24, 1986, Moore advised Burt that the liability insurance carrier for the period December 1971 through January 1977 was Federal Insurance Company and that the liability insurance carriers since 1978 were Cigna Insurance Company and Liberty Mutual Insurance Company. Hurd Affidavit in Opposition to Partial Summary Judgment, ¶¶ 16–17 and Exhibits N and O. By letter dated April 14, 1988, counsel for Burt again requested Moore identify any insurance carriers who may have provided insurance coverage to Moore and Burt prior to Moore's sale of Burt in 1983. *Id.*, ¶ 23 and Exhibit T. On May 3, 1988, Moore sent Burt a listing of its liability insurance carriers which, for the first time, identified Aetna as Moore's insurance carrier from December 31, 1963 through December 31, 1971. *Id.*, ¶ 25 and Exhibit W. Aetna, however, was unable to locate any relevant policies and, according to its records retention and destruction program, had destroyed any underwriting records and policies issued between 1963 and 1971. Mugel Affidavit, Ex. 24, ¶ 6.

■ This record demonstrates that although Burt did not learn that Aetna was an insurer until May, 1988, Burt was not dilatory in searching for the relevant insurance policies. Rather, it demonstrates that, contrary to Aetna's assertion, Burt did conduct a search of its own premises for any relevant policies. When such search failed to produce any relevant insurance policies, Burt requested Moore search its records for the same. Moore, however, was also unable to locate any policies and it was not until May 3, 1988 that Moore located secondary evidence identifying Aetna as Moore's insurance carrier. On this record, the court finds Burt's search for relevant insurance poli-

cies was sufficiently diligent to permit Burt to rely on secondary evidence to establish the existence of the insurance policies.

### C. *Secondary Evidence*

■ Having demonstrated that it conducted a "diligent but unsuccessful, search and inquiry for the missing documents," *Burroughs Wellcome, supra,* at 1223, Burt may rely on secondary evidence to establish the existence of the missing insurance policies. *Colonial Tanning, supra,* at 922; *Burroughs Wellcome, supra,* at 1223. Evidence which has been held sufficient to establish the existence of an insurance policy includes copies of policies for the relevant years, "certificates of insurance, letters discussing coverage, letters discussing renewal of coverage, portions of policies, letters referring to claims ... during relevant years, endorsements, excess policies that refer to [the putative insured's] primary coverage, and the minutes of [the insured's] board of directors' meeting evidencing the company's initial decision to procure [ ] liability insurance in [the relevant time period]." *Burroughs Wellcome, supra,* at 1222–23. In this case, the plethora of secondary evidence provided by Burt establishes, by a preponderance of the evidence, that Aetna issued CGL insurance policies to Moore, and that such policies also provided coverage to Burt.

In response to Burt's request that Moore attempt to determine from secondary sources insurance policy numbers or other relevant information to establish the existence of the Aetna policies, Moore, by letter dated May 3, 1988, provided Burt with a listing of liability insurance carriers providing coverage to Burt for the period December 31, 1963 through December 31, 1971, under the following policy numbers:

| Policy Number | Dates of Coverage |
| --- | --- |
| 01AL26334CM(Y) | 12/31/63–12/31/65 |
| 01AL042774CM(Y) | 12/31/65–12/31/67 |
| 01AL143628CM(Y) | 12/31/67–12/31/69 |
| 01AL143622CM(Y) | 12/31/69–12/31/70 |
| 01AL143628CM(Y) | 12/31/70–12/31/71 |

Mugel Affidavit, Exhibit 22.

The basis for Moore's determination that Burt was insured under the above policies

is a series of letters Moore discovered in an old claims correspondence file indicating claims filed against Moore which Moore submitted to Aetna for indemnification and defense under insurance policies Aetna issued to Moore during the relevant time period. Plaintiff's Memorandum at 22.

By letter dated June 16, 1988, Dustin P. Ordway, of counsel to Beveridge and Diamond, attorneys for Burt, to Aetna Senior Claim Representative Robert Beckstrand, Ordway provided Beckstrand with a master list of insurance carriers whom Burt had put on notice with regard to the DEC claims pending against Burt. Mugel Affidavit, Ex. 26. Ordway referenced the above stated Aetna insurance policy letters in the letter's caption. *Id.* In a letter to Beckstrand dated October 17, 1988, E.A. Grisaru[2] of Beveridge and Diamond memorialized a conversation he had earlier that day with Beckstrand in which Beckstrand acknowledged that he recognized the policy numbers referenced in Ordway's June 16, 1988 letter as pertaining to Aetna policies. *Id.*, Ex. 25. Aetna has not disputed either the accuracy of the letter, or Beckstrand's oral acknowledgment to Girasu.

Financial statements for the years 1963 to 1971 indicate Burt allocated funds for prepaid comprehensive liability insurance policies issued by Aetna, each policy providing $1,000,000 in coverage for the period December 31, 1963 through December 31, 1971. Mugel Affidavit, Exs. 63–71. The Aetna policy numbers referenced on the financial statements are consistent with those Moore provided to Burt in May 1988. *Id.*

Aetna Claims Counsel Robert E. Hyland testified in a deposition taken by Burt on October 25, 1995. Mugel Affidavit, Ex. 46 ("Hyland Deposition T."). According to

Hyland, Aetna conducted a search of its computerized claim data file ("CDF") for any references to the same insurance policy numbers with which Moore provided Burt in May, 1988.[3] Hyland Deposition T. at 24, 27. Information contained for each claim in the CDF includes the relevant insurance policy number, claim number, date of the claimed loss, the date and amount of insurance payments made for the loss, and any reserve amounts established relative to the claim. *Id.* at 25. Hyland explained the results of the document generated by the computerized CDF search of the insurance policy numbers ("the CDF history") under which Burt seeks coverage.[4] *Id.* at 28–47. Hyland also explained that as claim files older than 20 years would have been destroyed under Aetna's document retention and destruction program, Aetna was able to conduct only CDF searches for information on claims older than 20 years. *Id.* at 55–56. Hyland agreed that evidence of payment of an insurance premium would be considered as evidence that a policy was issued, although such evidence would not conclusively establish the existence of a policy, nor would it indicate the type of policy or amount of coverage. *Id.* at 64–65. Hyland also agreed that further evidence that would be considered in determining whether a policy existed included a certificate of insurance, an insurance binder, and both claim and underwriting correspondence between Aetna and the alleged insured. *Id.* at 65–66.

According to Hyland, an entry on the CDF history indicated that in May 1970, a general liability claim was filed under Aetna insurance policy No. 143628, which Hyland admitted was one of Aetna's policy numbers under which Burt claims coverage through Moore. Hyland Deposition T.

**2.** According to the letter, Gisaru's admission to the New York Bar was pending.

**3.** Although the record does not clearly stated the exact date the CDF search was conducted, that Hyland testified it was conducted pursuant to a request made on June 21, 1988,

Hyland Deposition T. at 24, and attached to an interoffice memorandum dated June 27, 1988, indicated the search was conducted between those two dates. *Id.,* at 28.

**4.** A copy of the CDF history is attached as Exhibit 45 to the Mugel Affidavit.

at 32–34. As the claim was a general liability claim, Hyland presumed policy No. 143628 was either a "stand-alone" general liability policy or a combination general liability and automobile liability policy. *Id.* at 33–34. The entry further indicated that no payments were ever made to the claimant, whose name was Bickel, although a reserve fund was established with regard to the claim, and the date the claim file was closed. *Id.* at 34–35. Another page of the CDF history reflected that there was no claim activity under Aetna policy No. 01AL143622, which, according to Hyland, was issued to Green Tree Stud, although that number also corresponded to one listed in Moore's May 3, 1988 letter to Burt. *Id.* at 43.

Hyland interpreted the CDF history with respect to another claim against Moore made under Aetna insurance policy No. 01AL42774. Hyland Deposition T. at 36. According to Hyland, the policy was a general liability policy for calendar year 1965. *Id.* at 36–37. The claimant was one Tannery. *Id.* Two other claims were filed against that same policy with respect to claimants named "R. Thomas" and "Nolan Pape." *Id.* at 38. No payments were made to any claimant under the policy, although reserves were established. *Id.* at 38–39. According to Hyland, the CDF history indicated that policy No. 42774 was reissued to Moore for 1966 and other claims were filed against it. *Id.* at 39–41. Hyland admitted that policy No. 42774 corresponded to one of the policy numbers which Burt alleges Aetna issued to Moore. *Id.* at 40.

Hyland stated that Aetna policy No. 01AL26334 which, according to the CDF history, covered the years 1962–1964, including 1963, corresponded to the number of one of the policies which Burt alleges Aetna issued to Moore. Hyland Deposition T. at 41–42.

Hyland acknowledged that Aetna, from 1963 to 1971, maintained an office in Toronto, Ontario, Canada, out of which he believed Aetna issued insurance policies. Hyland Deposition T. at 50–51. Hyland also testified he "believe[d] that there is evidence to indicate that we [Aetna] did, in fact, insure Moore Company at one time." *Id.* at 47.

Hyland was then asked questions regarding correspondence between Aetna, Moore and Marsh & McLennan Limited ("Marsh"), the Toronto insurance broker through whom Moore obtained its insurance coverage.[5] Hyland Deposition T. at 67–70. These letters refer to liability claims made against Moore for which Moore sought insurance coverage under Aetna insurance policies, including Policies Nos. 1 AL 26334 CM(Y), 01AL–042774–CM, and 01AL143628. Mugel Supplemental Affidavit, Ex. 3. Significantly, a February 2, 1967 letter written by Marsh to Moore references a claim made by one Ronald Thomas with regard to an accident on October 24, 1966 for which Moore filed an insurance claim under Aetna policy No. 01AL–042774–CM. Mugel Supplemental Affidavit, Ex. 3 at 5–6. The information contained in this letter is consistent with Hyland's explanation of the entry in the CDF history indicating that an insurance claim was made by the insured against Aetna general liability insurance policy No. 42774, originally issued in 1965 to Moore and renewed in 1966, with regard to a loss claimed by "R. Thomas." Hyland Deposition T. at 36–40.

Similarly, a letter dated August 20, 1968 from Marsh to Moore references a claim asserted against Moore by Roger Tannery. Mugel Supplemental Affidavit, Ex. 3 at 7. According to this letter from Marsh, Aetna had settled the claim under insurance policy No. 01AL042774 CM(Y). *Id.* This information is consistent with Hyland's explanation that a claim had been filed under Aetna insurance policy No. 01AL42774, a general liability policy for calendar year 1965, based on a loss claimed by "Tannery." Hyland Deposition T. at 36–37.

---

5. Copies of these letters are attached as Exhibit 3 to the Mugel Supplemental Affidavit.

Letters from Aetna to Moore dated March 19 and June 25, 1970, from Moore to Marsh dated June 11 and October 1, 1970, and from Marsh to Moore dated June 11 and September 19, 1970, all refer to a claim made by Bickel, the time of which corresponds to the same Bickel claim Hyland discussed in his deposition with regard to the CDF history. Mugel Supplemental Affidavit, Ex. 3. Moore's United States counsel, Cohen Swados Wright Hanifin Bradford & Brett ("Cohen Swados"), provided Burt with additional correspondence concerning the Bickel claim and Moore's attempt to obtain coverage of that claim from Aetna. Mugel Affidavit, Ex. 50. According to the affidavit of Larry P. Kerman, Esq., of Cohen Swados, these letters were found during a search conducted at Kerman's direction by Alec Milne, Moore's Corporate Risk Manager, to determine whether Moore was insured under the Aetna insurance policies in question. Mugel Affidavit, Ex. 48, 3. Upon being advised by Milne of the Bickel matter, Cohen Swados, searched its own archived client files regarding the Bickel claim and found the additional documents. *Id.* 4–6. Notably, these letters make extensive references to an Aetna insurance policy issued to Moore under which Moore and Aetna disputed whether Moore was covered as to an environmental claim and correspond to other entries in the CDF history. Mugel Affidavit Ex. 50. Cohen Swados later discovered additional documents pertaining to the Bickel claim and which demonstrate that Aetna issued liability insurance policies to Moore. Mugel Supplemental Affidavit, Ex. 6.

Burt also submitted portions of the transcript of a deposition taken by Burt of Moore's Corporate Risk and Insurance Manager Alexander Edward Milne ("Milne"), on February 26, 1997, pursuant to letters rogatory served upon Milne individually and as Moore's corporate representative ("Milne Deposition T.").[6] Milne testified that as Corporate Risk Manager, he was responsible for Moore's insurance program worldwide, which included providing insurance for Moore's subsidiaries, as had been Moore's custom since 1938 when Milne commenced employment with Moore. Milne Deposition T. at 10–12. Milne stated that his review of Moore's previous insurance policies demonstrated that Moore provided insurance coverage for all of its subsidiaries and affiliates. *Id.* at 14–15. In particular, Milne located records establishing that Burt was specifically named as an insured on other liability insurance policies issued to Moore, including Federal Insurance Company, Insurance Company of North America, and Liberty Mutual Insurance Company. *Id.* at 35–36, 39, 47–50. According to Milne, Burt is also a named insured on an excess liability insurance policy issued to Moore by The Home Insurance Company, effective December 31, 1968 through December 31, 1971, a copy of which Milne identified at his deposition.[7] Milne Deposition T. at 51–55. Milne further explained that an inspection of the excess insurance policy revealed that Aetna is listed as an underlying insurance carrier. *Id.* Milne stated that for Burt to be listed on the excess insurance policy, Burt would have to be insured under the primary insurance policy issued by Aetna. Milne Deposition T. at 57.

Milne testified at his deposition that as of August 25, 1972, a Mr. Gausby was responsible for both insurance placement and claims pertaining to Moore's insurance program. Milne Deposition T. at 70. Milne also stated that it was Moore's custom and practice to insure all its subsidiaries. Milne Deposition T. at 78.

At his deposition, Milne produced copies of documents and letters taken from Moore's Insurance Risk Management

6. Portions of Milne's Deposition Transcript are attached as Exhibit 51 to Mugel Affidavit and as Exhibit 2 to Mugel Supplemental Affidavit.

7. A copy of the excess liability insurance policy is attached as Ex. 47 to the Mugel Affidavit.

files.[8] Milne Deposition T. at 89–90. These documents include eight letters dated March 17, 1972 to Moore's then subsidiaries, including Burt, advising that Moore had paid the premium for the 1972 new General Liability Insurance policy and the renewal of the excess or umbrella policy. Mugel Supplemental Affidavit, Ex. 4. The letters further explain that

> [t]he new General liability policy has been placed with Federal Insurance Company, New York since Aetna, the former carrier, were insisting on a very considerable premium increase for renewal. The excess policy has been renewed with Home Insurance Company.

*Id.*

Milne also produced additional documentation discovered in Moore's insurance claims files involving other claims against Moore which Aetna handled on Moore's behalf.[9] Such claims include one dating from May 9, 1972 which Moore wrote was "under the jurisdiction of Aetna Casualty who was our carrier at the time." Moore letter dated September 8, 1975 to Marsh, Mugel Supplemental Affidavit, Ex. 5. Aetna was Moore's liability insurance carrier as of May 11, 1970, the date of the accident on which the "Faust" claim is predicated. Moore letter dated February 4, 1974 to Moore's subsidiary, Moore Business Forms, Inc. ("Moore Business"); January 24, 1974 notice from Marsh to Moore Business, advising of claim settlement; Moore-Business letter dated October 13, 1972 to Aetna advising that Aetna representatives would be permitted to photograph the site pertaining to the Faust claim; and August 17, 1972 letter from Moore to Moore Business; regarding Faust claim. Other letters refer to five additional claims for which Moore sought coverage from Aetna pursuant to insurance policies issued on behalf of Moore and its subsidiaries. Mugel Affidavit, Ex. 5.

Burt deposed several other former and current officers of Moore and Marsh who had personal knowledge of Moore's liability insurance coverage for the years 1963 through 1971. In particular, John T. Band, a former Account Executive with Marsh, was deposed on March 25, 1997. Mugel Affidavit, Ex. 52 ("Band Deposition T."). Band stated that he commenced working with Marsh in 1960, and assumed responsibility for Moore's account in 1962 or 1963. *Id.* at 6–8, 9. Band recalled that Aetna was Moore's primary liability insurance carrier for "a number of years," Home was the excess carrier, and that Burt was a named insured on all the policies *Id.* at 11–15, 26, 29, 36. Band explained that Moore's liability insurance coverage provided coverage for its subsidiaries because

> I [Band] would have had my neck in a noose if it didn't. It's the first thing you learn: cover it all. You see, Moore Corporation was just the holding company.... So everything underneath that were the operating companies.... And the operating companies were the ones that could generate the problem.

*Id.* at 15–16.

As an Account Executive with Marsh, Band primarily dealt with Arthur Gausby, Moore's Secretary/Treasurer. Band Deposition T. at 19. Upon receiving policies from insurance carriers, Band would deliver them to the insured. *Id.* at 20. When asked whether Burt was a named insured on the Aetna policies issued to Moore, Band replied, "Absolutely." *Id.* at 23.

Donald Stevenson Dunlop was deposed on February 17, 1997. Mugel Affidavit, Exhibit 53 ("Dunlop Deposition T."). Dunlop stated that when he joined Moore as an accountant in the early 1950s, Burt was a subsidiary and operating unit of Moore and Dunlop traveled to Burt several times a year to perform internal audits. Dunlop

---

**8.** Copies of these documents and letters are attached as Exhibit 4 to Mugel Supplemental Affidavit.

**9.** Copies of such documentation are attached as Exhibit 5 to Mugel Supplemental Affidavit.

Deposition T. at 6–7. Each operating unit, including Burt, had an insurance expense account and a prepaid insurance account, both of which Dunlop audited. *Id.* at 9. When Dunlop was promoted to Moore's auditor in the early 1960s, it was Moore's policy to arrange for corporate-wide insurance coverage, as it "was a more efficient and effective way of maintaining insurance coverage for the various operating units." *Id.* at 15. Like Band, Dunlop identified Gausby as the main contact at Moore with regard to obtaining insurance coverage from Marsh for Moore's various operating units and subsidiaries. *Id.* at 16. As an auditor, Dunlop was required to audit the allocation of insurance costs to each operating unit. *Id.* at 17. Burt's quarterly financial reports included prepaid insurance and expense analysis for the years 1963 through 1971, and Dunlop testified that Burt would not have listed such an expense on its financial statements if no such policy existed. *Id.* at 30.

George G. Flint, formerly Special Assistant to the Controller at Burt and later employed as the Chief Accountant in Moore's corporate head office, was deposed on February 26, 1997. Mugel Affidavit Ex. 54 ("Flint Deposition T."). Flint stated that Moore had a blanket insurance program covering Moore and all its subsidiaries. Flint Deposition T. at 18–19. Flint also stated that in carrying out his responsibilities at Burt, he was required to know who Moore's corporate insurance carriers were, and recalled that for the years 1960 through 1966, Aetna wrote the comprehensive general liability policy for Moore. *Id.* at 18–20. As Moore allocated the insurance expense premiums among the covered subsidiaries, the fact that Burt was charged an allocated premium indicated that Burt was covered under Moore's policy. *Id.* at 19, 26. According to Flint, Aetna provided CGL coverage to Burt for calendar years 1963 through 1971. *Id.* at 22–24, 26, 27–36.

Former Moore employee Peter Thiessen was deposed on February 27, 1997. Mugel Affidavit, Ex. 55 ("Thiessen Deposition T."). Thiessen commenced employment with Moore in 1972 as a Senior Accounting Clerk and reported to Flint, a job which required Thiessen to review Burt's records including reviewing and auditing Burt's year-end financial statements. Thiessen Deposition T. at 5–6, 12. Thiessen routinely processed payment of invoices, including insurance premium invoices, and recalled that Arthur Gausby and Donald Dunlop were the Moore employees who were primarily responsible for obtaining insurance coverage. *Id.* at 13. According to Thiessen, insurance coverage for Moore's North American components, which include Burt, was handled by Moore's Toronto office. *Id.* at 14–15. Thiessen recalled that it was Moore's custom and practice to insure all its subsidiaries and affiliates, including Burt, and that Aetna was a carrier for Moore. *Id.* at 15–16.

Former Moore employee Arthur Tamblyn Gausby was deposed on March 25, 1997. Mugel Affidavit, Ex. 56 ("Gausby Deposition T."). Gausby commenced employment with Moore in 1937 where he worked until retiring on January 1, 1978. Gausby Deposition T. at 6–7. Gausby's last position with Moore was as Assistant Treasurer of Moore as well as of each of Moore's subsidiaries, including Burt. *Id.* In that position, Gausby was responsible for placing insurance for Moore and its subsidiaries, including Burt. *Id.* at 6–7, 9–10. Gausby explained that Moore obtained a blanket liability policy for all its North American subsidiaries. *Id.* at 10–11. Gausby served as Assistant Treasurer from the mid–1960s until he retired. *Id.* at 12, 15. During that time, Burt had liability insurance coverage provided by Moore. *Id.* at 12. Gausby stated he was involved in the placement of those policies, that Moore obtained insurance through Marsh, an insurance broker located in Toronto, and that John Band was the agent for Marsh who negotiated the insurance policies for Moore. *Id.* Gausby recalled

that Moore would receive the actual insurance policies from the carriers, including Aetna, but that Moore did not forward such policies or copies thereof to any subsidiary, including Burt. *Id.* at 13, 25, 75. Periodically, Gausby would visit Moore's subsidiaries, including Burt, to discuss how specific insurance risks were controlled, although any coverage specific to one subsidiary's operations would have been obtained in addition to, rather than in place of, coverage provided by Moore. *Id.* at 18–19. Gausby stated that Moore maintained a blanket insurance policy under which Burt was covered, that Aetna was a carrier for Moore, that Burt was insured under Aetna policies issued to Moore, and that a portion of the insurance premium was allocated to each subsidiary, including Burt, although the subsidiaries never received copies of either the policies or the premium invoices. *Id.* at 22, 25–27, 43–44, 47, 49–50, 75. Gausby identified an endorsement as the part of an Aetna policy which extended coverage obtained by Moore to Moore's subsidiaries, including Burt. *Id.* at 38–39. Gausby, who was responsible for approving payment of insurance premiums, recalled receiving invoices for Aetna insurance policy premiums, and also had actual physical possession of the insurance policies in his office at Moore. *Id.* at 40–41, 80.

Richard L. Ward, former Vice–President, Comptroller and Assistant Secretary of Burt, was deposed on March 18, 1997. Mugel Affidavit, Ex. 57 ("Ward Deposition T."). Ward stated that from 1958 to 1968, he worked as a General Accountant with Burt and his responsibilities included assembling financial information for incorporation into Burt's annual financial statements. Ward Deposition T. at 5–6. Ward recalled that most of Burt's insurance coverage was provided through Moore's corporate office in Toronto. *Id.* at 13. Upon obtaining insurance coverage for Burt, the portion of the premium Moore charged to Burt was reflected in Burt's financial statements. *Id.* at 51–52. From 1963 through 1972, Burt routinely prepared annual financial reports for submission to Moore and such reports included a prepaid insurance schedule. *Id.* at 34, 38–39. The schedules [10] indicate that Moore charged Burt a portion of a premium paid for a CGL insurance policy issued by Aetna for the years 1963 through 1971 as follows:

| Coverage Dates | Policy No. | Premium Charged | Coverage |
|---|---|---|---|
| 12/31/63–12/31/64 | 1AL26334CM | $725 | $1 million |
| 12/31/64–12/31/65 | 1AL26334CM | $748 | $1 million |
| 12/31/65–12/31/66 | 1AL26334CM | $748 | $1 million |
| 12/31/66–12/31/67 | 01AL042774CM(Y) | $2,310 | $1 million |
| 12/31/67–12/31/68 | 01AL042774CM(Y) | $2,310 | $1 million |
| 12/31/68–12/31/69 | 01AL143628CM(Y) | $1,554 | $1 million |
| 12/31/69–12/31/70 | 01AL143628CM(Y) | $777 | $1 million |
| 12/31/70–12/31/71 | 01AL143628CM(Y) | $777 | $1 million |

Assuming, *arguendo*, that any of the information discussed above is hearsay, the court finds that such information would, nevertheless be admissible under the residual exception to the hearsay rule, Fed.R.Evid. 807 as it has "equivalent circumstantial guarantees of trustworthiness." [11] In particular, each item of secondary evidence is largely corroborated by other items of secondary evidence, including Aetna's CDF history, correspondence as to Aetna insurance policies issued to Moore and referencing prior insurance claims filed with regard to such coverage, transcripts of depositions and affidavits of current and former employees of Moore,

---

**10.** Copies of the prepaid insurance and expense analysis schedules included in Burt's annual financial statements for the years 1963 through 1971 are attached as Exhibits 63 though 71 to the Mugel Affidavit.

**11.** Fed.R.Evid. 807 provides in relevant part: A statement not specifically covered by Rule 803 [Hearsay Exceptions; Availability of Declarant Immaterial] or 804 [Hearsay Exceptions; Declarant Unavailable] but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Burt and Aetna, the excess insurance policy certificate issued by Home endorsing Burt and indicating Aetna was the underlying carrier, and letters found in Moore's old claim files regarding claims Moore filed with Aetna during the relevant period of time. Significantly, Aetna has not challenged either the accuracy or the veracity of any of the evidence submitted by Burt in support of summary judgment, has not submitted any evidence tending to contradict Burt's assertion that Aetna issued the claimed policies, nor any information demonstrating the existence of any ambiguity which must be resolved in Aetna's favor, precluding summary judgment. For example, Aetna has not submitted any business records demonstrating that Moore is not among a list of customers for any of the relevant years, or testimony from any employee that Aetna did not issue any insurance policy to Moore. To the contrary, Hyland, Aetna's own representative, confirmed as much. Hyland Deposition T. at 74–75, 79–81.

Such secondary evidence could support a reasonable jury finding, by a preponderance of the evidence, that Burt has demonstrated Aetna issued the claimed insurance

policies. *Anderson, supra,* at 254–56, 106 S.Ct. 2505 (correct summary judgment question is whether evidence in the record could support a reasonable jury finding that plaintiff has or has not demonstrated factual issue by applicable evidentiary standard); *see Burroughs Wellcome, supra,* at 1222–23 (considering correspondence describing asserted coverage, renewal of coverage and referencing claims submitted under alleged policies during relevant years, endorsements and excess policies referring to the putative insured's primary carrier sufficient to establish existence of the claimed insurance coverage).[12] Further, Aetna, by failing to submit anything contradicting the secondary evidence, has failed to demonstrate the existence of a material issue of fact requiring submission to the jury so as to avoid summary judgment in favor of Burt. *Goenaga, supra,* at 18 (once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to avoid summary judgment, produce evidence sufficient to support a jury verdict in its favor and may not rely on conclusory statements

**12.** Aetna points to a discrepancy as to one of the policy numbers. Defendant's Memorandum in Opposition to Summary Judgment at 22 n. 5. Specifically, the policy number Moore provided Burt with regard to coverage for the period December 31, 1969 through December 31, 1970, *i.e.,* No. 01AL143622CM(Y) is reflected on Aetna's CDF history as belonging to Green Tree Stud, Inc., and is inconsistent with Burt's financial records reflecting continuous coverage under Aetna policy No. 01AL143628CM(Y) for the years 1969 through 1971. Id. The sole discrepancy between the two policy numbers consists of the last numeral in the former being "2" while the last numeral in the latter is "8." Such discrepancy is, however, logically explained as a typographical error.

First, Aetna, by arguing that the terms of the pollution exclusion which Aetna first endorsed in June 1970 state that the exclusion is effective from the inception date of the policy to which it applies, means the exclusion would, by its terms, relate back to the inception of Aetna policy No. 01AL143628CM in

1969, has conceded that if the court finds Aetna provided coverage to Burt, that one policy was in effect for the years 1969, 1970 and 1971. *See* Defendant's Memorandum of Law in Opposition to Summary Judgment at 22; Discussion, *infra,* at 622–624. Second, not only does Burt's 1970 Prepaid Insurance and Expense Analysis indicate that for the year 1970, Moore charged Burt a premium for Aetna CGL policy No. 01AL143628CM(Y) for period December 31, 1969 through December 31, 1970, the same analysis also lists the expiration date of that policy as December 31, 1971. Mugel Affidavit, Ex. 70. Third, Burt's 1969 Prepaid Insurance and Expense Analysis indicates that for the year 1969, Moore charged Burt a premium for Aetna insurance policy No. 01AL143628CM(Y), for which the expiration date is "12/31/7." Although the last digit in that date's two digit abbreviation for the year is obscured, that the first digit for the year is "7" indicates that the policy to which it pertains was in effect at least for the years 1969 and 1970. On this record, the court finds the discrepancy in policy numbers is logically explained as a typographical error.

or contentions challenging the credibility of the moving party's evidence). Accordingly, the court finds that Burt has submitted sufficient evidence to establish, by a preponderance of the evidence, justifying summary judgment that Moore obtained CGL insurance policies from Aetna for the years 1963 through 1971 in the amount of $1,000,000, and that Burt was covered as an additional insured under those policies.

### 3. *The Pollution Exclusion*

Aetna contends that the pollution exclusion that generally endorsed its CGL insurance policies issued since June 1970 negates any obligation to defend or indemnify Burt under any insurance policy to which the pollution exclusion applies. Defendant's Memorandum in Opposition to Summary Judgment at 22; Kelley Affidavit, Ex C. The pollution exclusion excludes from coverage liability for any discharge of contaminants that is not "sudden and accidental." Kelley Affidavit, Ex. C. Further, the pollution exclusion declares it is "effective on the inception date of the policy unless otherwise stated herein." *Id.* According to Burt, Aetna issued policy No. 01AL143628CM to Moore, covering the years 1969 through 1971. Aetna thus maintains that as the pollution exclusion, by its terms, relates back to the inception of the policy, coverage for the years 1969 through 1971 is precluded.

 Once an insured has satisfied the initial burden that a covered loss has occurred, the burden shifts to the insurer to demonstrate that the alleged loss is excluded from coverage. *Continental Casualty Co. v. Rapid–American Corporation,* 80 N.Y.2d 640, 593 N.Y.S.2d 966, 972–73, 609 N.E.2d 506 (1993); *Seaboard Sur. Corp., supra,* at 275, 486 N.Y.S.2d 873. The insurer's burden of proof that an exclusion exempts a claim from coverage is, however, a heavy one. *New York v. Blank,* 27 F.3d 783, 789 (2d Cir.1994) (citing *McCormick & Company, Inc. v. Empire Insurance Group,* 878 F.2d 27, 30 (2d

Cir.1989)); *Continental Cas. Co., supra,* at 973.

As discussed, none of the Aetna insurance policies at issue in the instant case have been located. As such, it is not possible to determine from the actual policies, *i.e.,* Aetna insurance policies Nos. 1AL26334CM, 01AL042774CM(Y) and 01AL143628CM(Y), whether the pollution exclusion was attached as an endorsement to any of those policies. Aetna, in attempting to establish the pollution exclusion was applied to policy No. 01AL143628CM(Y), covering the years 1969 through 1971, submitted a copy of the standard pollution exclusion endorsement. Kelley Affidavit, Ex. C.

 The court's research has revealed no case on point, nor has either party cited any authority, dealing with the specific issue of what evidence is necessary to establish that a particular insurance policy was endorsed by a pollution exclusion. Rather, reported federal and New York cases concerning the applicability of an insurance exclusion deal with whether the particular loss claimed is an exception to an exclusion, or whether the terms of the exclusion preclude coverage for the claimed loss. *See, e.g., Blank, supra* (considering whether claimed loss qualified as an exception to pollution exclusion, thereby requiring insurer to defend it); *Continental Cas. Co., supra* (considering whether language of pollution exclusion was ambiguous); *Seaboard Surety Co., supra* (discussing whether exclusionary clause was ambiguous so as to determine whether insurer had duty to defend claims). The cases do not, however, discuss the insurer's burden of proof in establishing that a particular insurance policy was endorsed by an exclusionary clause. However, the court finds that as a party seeking to establish by secondary evidence the existence of an insurance policy is required to demonstrate that existence by a preponderance of the evidence, *see* Discussion, *supra,* pp. 610–612, it follows that an insurer seeking to avoid liability based on an

exclusionary clause should be required to prove its existence by at least the same preponderance of the evidence standard, if not by clear and convincing evidence, given that the insurer's burden of proof that a claim is exempt from coverage based on an exclusion is heavy. *Blank, supra*, at 789.

■ In connection with this exhibit, Aetna's Second Vice President in the Special Liability Coverage Unit of Travelers Indemnity Company Patricia Kelley states: "In or about June, 1970, Aetna endorsed its typical policy to contain a pollution exclusion. A true copy of the pollution exclusion endorsement is annexed hereto as Exhibit C." Kelley Affidavit, ¶ 4. The parties agree that any CGL insurance policy issued by Aetna to Moore between 1963 and 1971 would have been a typical policy. See Kelley Affidavit, Exs. A and B; Mugel Affidavit, Exs. 59 and 61. Aetna also points to Hyland's deposition testimony that Aetna first utilized the pollution exclusion endorsement on or about June 1970. Defendant's Memorandum in Opposition to Summary Judgment at 21 (citing Hyland Deposition T. at 62). However, neither Kelley's Affirmation nor Hyland's deposition testimony would qualify as admissible hearsay under Fed.R.Evid. 807, the residual hearsay exception. *See* Discussion, *supra*, at 620–622. To the contrary, given the high degree of self-interest of the assertions, there is ample reason to reject them as inadmissible under Fed. R.Evid. 807.

■ In particular, Kelley neither indicates that she has personal knowledge that the pollution exclusion was made an endorsement to every "typical policy," nor identifies her source for such statement. Although Aetna's Claim Counsel Hyland stated at his deposition that Aetna utilized the pollution exclusion endorsement beginning in June 1970, he does not state that he has any personal knowledge that any specific insurance policy, such as one issued by Aetna covering Moore, was endorsed by a pollution exclusion. Nor does Hyland indicate to what percentage of

CGL policies the endorsement was applied. Hyland Deposition T. at 62. Hyland also states that insurance policies for years prior to 1970 would not have contained the endorsement, *id.*, which avoids the question as to whether the endorsement could have been applied retroactively to a policy that was first issued on December 31, 1968. Indeed, neither Kelley nor Hyland point to any documents tending to corroborate their assertions, *i.e.*, implying the exclusion was, in fact, endorsed on the CGL policies issued to Moore at that time. That the evidence Aetna submits is hearsay and, thus, would be inadmissible at trial to prove its claim that at least one of the insurance policies issued by Aetna to Moore was endorsed by a pollution exclusion is significant as summary judgment may not be granted on the basis of inadmissible evidence. *Bridgeway Corporation v. Citibank*, 201 F.3d 134, 142 (2d Cir.2000).

Further, even if such information were admissible, it is of little probative value. Although the "typical" insurance policy, which Kelley maintains would have been endorsed by the pollution exclusion, states that its terms shall not "be waived or changed, except by endorsement issued to form a part of this policy," Kelley Affidavit, Ex. B. p. 15, such language does not demonstrate that Aetna could unilaterally make retroactive changes to a policy either through an endorsement or otherwise. Toward that end, Aetna submits nothing indicating that once it began endorsing its typical policy with the pollution exclusion in June 1970, it also sought to retroactively attach the pollution exclusion to policies already in existence, either with or without the insured's permission, and that such retroactive application would be enforceable. Additionally, caselaw suggests Kelley's statement is less than complete as insurance companies doing business in New York, like Aetna, are permitted to use only those endorsements permitted by state law. *Matter of Liberty Mutual Insurance Company*, 82 N.Y.2d 57, 603

N.Y.S.2d 409, 623 N.E.2d 536, 538 (1993) ("If an attempted exclusion [in that case, an endorsement] is not permitted bylaw, the insurer's liability under the policy cannot be limited."). Significantly, it is unlikely that previous CGL insurance policies issued by Aetna to Moore were endorsed by any pollution exclusion as the use of such exclusions was not approved in New York until 1971. *See Continental Cas. Co., supra*, at 512. As the Court of Appeals stated,

> A pollution exclusion was required in all liability policies from 1971 through 1982 (see, former [New York] Insurance Law § 46[13], [14] ) to 'assure that corporate polluters bear the full burden of their own actions spoiling the environment' (1971 McKinney's Session Laws of N.Y., at 2633). Though the provision remains in use, since 1982 it has not been mandated because *no payments were being made on such liabilities*. Corporate polluters who could not insure themselves simply went out of business when the liability arose (1982 McKinney's Session Laws of N.Y., at 2628–2629).

*Continental Cas. Co., supra*, at 512.

Hence, Kelley's broad and undocumented assertion as to the applicability of the pollution exclusion endorsement is of insufficient probative value to be admissible pursuant to Fed.R.Evid. 807.

▆ Moreover, courts are permitted to *sua sponte* grant summary judgment against the *movant without notice* where the court's determination to do so is based on issues identical to those raised by the movant, the movant has had full opportunity for discovery, and it is unlikely the movant would have submitted additional evidence in support of summary judgment if movant had notice that the court may consider granting summary judgment in favor of the non-movant. *Bridgeway Corp., supra*, at 139–40; *See Coach Leatherware Company, Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991) (observing that " 'it is most desirable that the court cut through mere outworn procedural nice-

ties and make the same decision as would have been made had [non-movant] made a cross-motion for summary judgment.' ") (quoting *Local 33, International Hod Carriers Building and Common Laborers' Union of America v. Mason Tenders District Council of Greater New York*, 291 F.2d 496, 505 (2d Cir.1961)).

On this record, the court finds that, as a matter of law, Aetna has failed to submit anything demonstrating a genuine issue of material fact as to whether any of the insurance policies issued to Moore and also insuring Burt were endorsed by a pollution exclusion, or that it is entitled to summary judgment on that same issue. Further, according to the relevant scheduling order, discovery in this case was complete as of June 15, 1998 (Docket Item No. 112), prior to the date the instant motions were filed. As such, the court finds that Aetna had a full opportunity to obtain evidence necessary to either support its motion for summary judgment or to defend a cross-motion by Burt as to whether any of the relevant insurance policies were endorsed by a pollution exclusion. Having failed to do so, the court grants summary judgment in favor of Burt on this issue and, thus, Aetna may not avoid providing insurance coverage to Burt on the basis that policy No. 01AL143628CM(Y) was endorsed by the purported pollution exclusion.

### 4. *Sleepy Hollow Site*

Aetna argues it is not obligated to defend or indemnify Burt with respect to the Sleepy Hollow site as the DEC's letter, dated March 14, 1986, to Burt regarding to the site was not sufficiently adversarial to trigger Aetna's duty to defend or indemnify. Defendant's Memorandum of Law in Opposition to Summary Judgment at 15. In particular, Aetna maintains that Burt, by voluntarily entering into a Consent Order under which it made payments to the DEC for the cost of cleaning up the site, participated in an administrative proceeding which does not constitute a suit under New York law. *Id.* Aetna further asserts

that "an administrative agency letter does not constitute a suit where it merely informs a party of its potential liability and conveys the agency's interest in entering into discussions with the party". *Id.* at 16. In contrast, Burt maintains that the adversarial nature of the administrative proceeding was not undermined by its entering into the Consent Order with the DEC, and cites *Colonial Tanning Corp. v. Home Indemnity Company*, 780 F.Supp. 906, 916 (N.D.N.Y.1991) in support. Plaintiff's Memorandum at 44; Plaintiff's Reply Memorandum at 17.

Aetna's standard CGL policy for the years 1955 through 1965 provides, in relevant part,

If claim is made or suit is brought against the Insured, the Insured shall immediately forward to the Company [Aetna] every demand, notice, summons or other process received by him or his representative.

Kelley Affidavit, Ex. B at 4, ¶ 7; Mugel Affidavit, Ex. 59 at 4, ¶ 7.

Similarly, Aetna's standard CGL policy for the years 1966 through 1971 provides

If claim or suit is brought against the insured, the insured shall immediately forward to the company [Aetna] every demand, notice, summons or other process received by him or his representative.

Kelley Affidavit, Ex. C at 15, ¶ 4(c); Mugel Affidavit, Ex. 61 at 15, ¶ 4(c).

The words "claim" and "suit" are not defined in either standard CGL policy utilized by Aetna for the periods 1955 through 1965 or 1966 through 1971. Kelley Affidavit, Exs. A and B; Mugel Affidavit, Exs. 59 and 61.

In *Colonial Tanning Corp., supra,* the court did not reach the issue whether correspondence from the DEC seeking the plaintiff's voluntary cooperation and two consent orders executed between the plaintiff and the DEC in which the plaintiff agreed to pay a civil penalty and conduct a remedial investigation and feasibility study ("RI/FS") invoked the insurer's duty to defend as the DEC's eventual filing of a formal administrative complaint was found to be "sufficiently adversarial and coercive so as to constitute a suit within the meaning of the policies at issue." *Colonial Tanning Corp., supra,* at 916. Nevertheless, the court held that the adversarial or coercive nature of the administrative proceeding was unaltered by the plaintiff's decision, on its own initiative, to pay a civil penalty and begin an RI/FS. *Id.* The court observed that the results of the RI/FS could lead to further action by the DEC and that the plaintiff included in one of the consent orders an unequivocal reservation of rights. *Id.* Thus, the relevant inquiry is whether the letters Burt received from the DEC regarding the Sleepy Hollow site qualify as a "claim" or "suit" against Burt.

The New York Court of Appeals has yet to address this issue in any reported decision. Courts that have considered the issue as to whether letters sent by an administrative agency triggered an insurer's duty to defend have based their determinations on the extent to which the government, in such communications, "assumed a coercive, adversarial posture and threatened the plaintiffs with probable and imminent financial consequences." *Carpentier v. Hanover Insurance Company*, 248 A.D.2d 579, 670 N.Y.S.2d 540, 542 (1998). Further, "New York appears to have adopted a broad construction of the word 'suit.'" *Avondale Industries, Incorporated v. Travelers Indemnity Company*, 887 F.2d 1200, 1206 (2d Cir.1989) (addressing same issue as a matter of New York law).

In *Carpentier, supra,* the plaintiffs, owners of property on which the DEC discovered contaminated groundwater, received several letters from the DEC regarding such contamination. *Carpentier, supra,* at 541–42. Letters which the court found did not commence the insurer's duty to defend included a notification by the DEC that the property was to be listed in a registry of inactive hazardous waste disposal sites, a letter from the EPA requesting various

information about the site from the plaintiffs and two similar letters, one each from the DEC and the EPA, merely informing the plaintiffs of their potential liability and seeking voluntary action on their part. *Id.* at 542. A fifth letter, however, demanded payment of a large, specified sum of money on which interest would accrue as of the date of the demand, threatened to file a notice of lien against the property, and gave the plaintiffs the opportunity to be heard, with counsel present, at a conference with the EPA's regional attorney. *Id.* The court held that this fifth letter triggered the insurer's duty to defend.

Other cases hold to the same effect. *See Avondale Industries, supra,* at 1202, 1206 (holding insurer required to provide coverage as state environmental administrative agency letter notifying plaintiff that as a hazardous waste generator it was considered a PRP, demanding plaintiff provide information regarding substance generated and disposed of and advising disregard of such requests would result in fines and also demanding plaintiff submit cleanup plan and attend meeting with other PRPs sufficiently commenced suit); *Ryan v. Royal Insurance Company of America,* 916 F.2d 731, 742 (1st Cir.1990) (construing, under New York law, New York DEC letters to former owner of contaminated site as not triggering insurer's duty to defend as letters merely requested plaintiff submit remedial plan for approval and did not advise that plaintiffs were compelled to commence cleanup); *Borg–Warner Corporation v. Insurance Company of North America,* 174 A.D.2d 24, 577 N.Y.S.2d 953, 955, 960 (1992) (holding state administrative agency actions seeking plaintiff's voluntary participation in cleanup activities related to hazardous waste generated by plaintiff or plaintiff may be required to reimburse government for cleanup costs did not commence insurer's duty to defend) (citing *Avondale Industries, supra,* at 1206); *Technicon Electronics Corp. v. American Home Assurance Company,* 141 A.D.2d 124, 533 N.Y.S.2d 91, 104–105 (1988) (sending of EPA letter advising plaintiff, suspected generator of hazardous waste, of PRP status and inviting plaintiff to discuss plaintiff's voluntary participation in remedial measures did not constitute initiation of legal action requiring insured to defend insured), *aff'd on other grounds,* 74 N.Y.2d 66, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (1989).

In the instant case, Burt entered into the consent order with the DEC after receiving the DEC's letter of March 14, 1986, advising Burt that it had been identified as the generator of hazardous waste materials found in 18 drums at the Sleepy Hollow site. Hurd Affidavit, Exs. 18 (March 14, 1986 DEC letter), and 19 (consent order). Burt was further advised that it was liable for the cleanup of the Sleepy Hollow site "under New York State inactive hazardous waste site law." Hurd Affidavit, Ex. 18. The March 14, 1986 letter gave Burt two choices with regard to the cleanup of the Sleepy Hollow site: (1) it, along with the other liable parties who transported and disposed of the waste, could mutually agree as to funding and disposal of the waste; or (2) the DEC would utilize the State Superfund for the cleanup, and then "initiate proceedings to recover both the expended funds for such cleanup as well as substantial fines and penalties against *all* responsible parties." *Id.* The DEC advised Burt of a time and date to meet with the DEC, should Burt choose the first option, which was likely the more cost and time efficient one. *Id.* Burt was also advised that if the second option was chosen, the DEC would "then be *forced* to take necessary actions." *Id.* (emphasis added).

■ Unlike the letters which courts have determined did not engage an insurer's duty to defend, the DEC's letter of March 14, 1986 does not merely inform Burt of its potential liability and express the DEC's interest in discussing the situation. Instead, the letter unequivocally states that Burt is liable for the cleanup of the contaminated site. Burt is also un-

equivocally informed that if it does not voluntarily cooperate with the cleanup, including its costs, the DEC will take legal action against Burt to recover the costs of the cleanup and to impose fines and penalties against Burt. Simply put, a plain reading of this letter demonstrates the DEC informed Burt that as the generator of the hazardous waste found at the Sleepy Hollow site, Burt was responsible for the cost of cleanup and if Burt did not voluntarily participate, the DEC would undertake cleanup of the site and then take legal measures against Burt to recover cleanup costs and impose fines and penalties against Burt. The letter thus sufficiently "assume[s] a coercive, adversarial posture and threatens [Burt] with probable and imminent financial consequences," *Carpentier, supra*, at 542, thereby triggering Aetna's duty to defend.

5. *Notice, Disclaimer and Waiver Regarding Occurrences and Pfohl Landfill, Sleepy Hollow Site and Cline I Actions*

A. *Overview*

As the court has found that Burt has sufficiently demonstrated the existence and terms of the alleged Aetna CGL insurance policies and that Aetna has failed to demonstrate that any of the policies were endorsed by a pollution exclusion, so as to avoid summary judgment on this issue, it addresses whether Burt's notification of the occurrences for which it seeks coverage were timely and, if not, whether Aetna has waived its right to disclaim coverage. It is undisputed that each insurance policy Aetna issued to Moore under which Burt was covered required Burt notify Aetna of an "accident" or "occurrence" "as soon as practicable." Kelley Affidavit, Exs. A at 4 and B at 15; Mugel Affidavit, Exs. 59 at 4 and 61 at 15. The policies also required Burt to "immediately forward to the company every demand, notice, summons or

other process." Kelley Affidavit, Exs. A at 4 and B at 15; Mugel Affidavit, Exs. 59 at 4 and 61 at 15. The parties dispute whether Burt provided timely notice to Aetna of the occurrences and claims for which defense and indemnity coverage is sought with regard to the Pfohl Landfill and Sleepy Hollow site, thereby violating the notice provisions contained in the insurance policies which are conditions precedent to coverage. The parties also dispute whether Burt's notification of the *Cline I* suit, which seeks recovery only for property damage, was timely.[13]

In particular, Aetna maintains that Burt knew of potential claims against it with regard to the Pfohl Landfill by March 20, 1985, when the DEC notified Burt that it has been "identified as a generator of wastes disposed of at" the Pfohl Landfill, yet failed to notify Aetna of such occurrence until May 6, 1988. Defendant's Memorandum at 5 (citing Jacobson Affidavit, Ex. 1 (May 6, 1988 Burt letter to Aetna), and Ex. 4 (March 20, 1985 DEC Letter to Burt)). Aetna asserts that despite entering into a consent order dated February 3, 1987 with the DEC for cleanup of the Sleepy Hollow site, Burt did not notify Aetna regarding its liability for the contamination at the Sleepy Hollow site until December 27, 1990, almost four years later. Defendant's Memorandum at 6 (citing Jacobson Affidavit, Ex. 5 (December 27, 1990 Burt Letter to Aetna), and Ex. 7 (February 3, 1987 Consent Order)). Also, Burt's entry into the consent order was predicated on the DEC's notification in March 1986 regarding wastes deposited at the Sleepy Hollow site. Defendant's Memorandum at 6. Aetna urges that as this court previously held as untimely Burt's notification to other insurers of the Pfohl matter on May 6, 1988, and of the Sleepy Hollow site on December 27, 1990, the law of the case doctrine dictates that Burt's notifications to Aetna regarding the Pfohl

---

**13.** Aetna does not assert similar arguments with regard to the Alltift Landfill or the Booth Oil site. Nor does Aetna assert it received late notice of the other private property damage actions, *i.e. Pfohl, Freier, Bartlebaugh,* and *Marzec*.

Landfill and the Sleepy Hollow site are also untimely. *Id.* at 5–6. Finally, Aetna maintains that although Burt was served with the *Cline I* Summons and Complaint on June 23, 1993, Burt did not notify Aetna of that claim until May 24, 1994, eleven months later. *Id.* at 18.

Burt does not dispute that the March 20, 1985 DEC letter constituted notice of Burt's liability regarding the Pfohl Landfill, that its entry into the February 3, 1987 Consent Order demonstrates Burt was aware of its liability for contamination at the Sleepy Hollow site at that time, or that it was served with the *Cline I* Summons and Complaint on June 23, 1993. Rather, Burt maintains it's notice to Aetna on these matters is timely under the particular circumstances presented in this case. Plaintiff's Reply Memorandum at 19. Specifically, Burt maintains that it reasonably and in good faith believed it was not responsible for the contamination at the Pfohl Landfill until August 18, 1986 when the DEC identified Burt as a PRP with regard to the Pfohl Landfill. *Id.* at 20–21. Burt further maintains its lack of knowledge of the existence of the Aetna policies until May 4, 1988, when Moore advised Burt that Aetna was Moore's insurance carrier for the period 1963 through 1971, excuses any late notice regarding the Pfohl Landfill and Sleepy Hollow site. *Id.* at 21–22. Finally, Burt argues that even if its notification to Aetna was untimely with regard to any of the relevant claims, Aetna has waived its right to deny coverage by failing to timely disclaim on that ground. *Id.* at 23.

■■■■ In determining the timeliness of notice of a disclaimer, the court must first determine when the obligation on the part of the insured to give notice accrued, and then whether the insured did in fact provide timely notice. *Olin Corp. v. Insurance Company of North America,* 743 F.Supp. 1044, 1053 (S.D.N.Y.1990), *aff'd,* 929 F.2d 62 (2d Cir.1991). In New York, the insured's duty to notify does not accrue upon receipt of a formal PRP letter or summons and complaint. *Ogden Corporation v. Travelers Indemnity Co.,* 924 F.2d 39, 43 (2d Cir.1991). Instead, the obligation to provide notice of an occurrence accrues when the facts known to the insured would have suggested to a reasonable person the possibility of a potentially covered claim. *Commercial Union Insurance Company v. International Flavors & Fragrances, Inc.,* 822 F.2d 267, 272 (2d Cir.1987); *Utica Mutual Insurance Company v. Fireman's Fund Insurance Companies,* 748 F.2d 118, 122 (2d Cir.1984). Compliance with notice requirements is a condition precedent to an insurer's liability under the policy, *International Flavors, supra,* at 271, and failure to comply with the notice requirement relieves an insurer of its duties to defend and indemnify, even where there has been no showing by the insurer of prejudice to itself. *Unigard Security Insurance Company, Inc. v. North River Insurance Company,* 79 N.Y.2d 576, 584 N.Y.S.2d 290, 594 N.E.2d 571, 573 (1992); *Security Mutual Ins. Co. v. Acker–Fitzsimons Corp.,* 31 N.Y.2d 436, 340 N.Y.S.2d 902, 293 N.E.2d 76, 78 (1972).

■■■■ Accordingly, the court, consistent with its earlier Report and Recommendation, finds that the March 20, 1985 letter from the DEC to Burt obligated Burt's to notify its insurers of an occurrence regarding the Pfohl Landfill. Report and Recommendation filed August 2, 1994 (Docket Item No. 56) at 21, adopted by Judge Arcara on March 14, 1995 (Docket Item No. 76). Burt's receipt in March 1986 of the DEC's written notification of its partial liability regarding the Sleepy Hollow site, and its subsequent entry into a consent order with the DEC in October 1986, further triggered Burt's obligation to notify its insurers as to the site. *Id.* Also, although when the court filed its earlier Report and Recommendation the private personal injury and property damage actions were not at issue, as Burt does not dispute that it was required to "immediately forward to the company every demand, notice, summons or other process," the

court finds that Burt's May 24, 1994 notification to Aetna regarding the *Cline I* action, eleven months after having been served with the Summons and Complaint, was untimely. Shorter delays in notifying an insurer of a claim have been held unreasonable under New York law. *See Blank, supra,* at 795–96 (ten month delay unreasonable under New York law); *City of Utica v. Genesee Management, Inc.,* 934 F.Supp. 510, 520–21 (N.D.N.Y.1996) (six months delay unreasonable); *Goodwin Bowler Associates, Ltd. v. Eastern Mutual Insurance Company,* 259 A.D.2d 381, 687 N.Y.S.2d 126, 126 (1999) (two months delay unreasonable). Further, while a late notice of an occurrence may be excused based on a good faith belief of non-liability, no such belief excuses a late notice of a claim. *Blank, supra* (holding, under New York law, untimely notification to insurer of claim is not excusable by insured's good faith belief of non-liability).

As stated, however, Burt offers three excuses for its late notification to Aetna of an occurrence at the Pfohl Landfill based on the 1995 DEC letter including that it had a reasonable good faith belief that it was not liable for contamination at the Pfohl Landfill until August 1986 when it was notified that it was a PRP, that it was unaware of the existence of the Aetna policies, and that, in any event, Aetna's disclaimer of coverage is void as untimely. As to the Sleepy Hollow site, Burt asserts as excuses for its untimely notification of occurrence its lack of awareness of the existence of the Aetna policies and, alternatively, that Aetna's disclaimer of coverage is untimely as a matter of law. With regard to the *Cline I* claim, Burt asserts only that Aetna's disclaimer of coverage was untimely.

 The court's inquiry is thus limited to whether Burt's late notifications regarding the occurrences at the Pfohl Landfill, the Sleepy Hollow site, and the *Cline I* claim are excusable. The question of whether delayed notification of an occur-

rence to an insurer generally is excusable is a matter of fact for the jury unless no excuse for the delay is proffered or the excuse is meritless as a matter of law. *Olin Corporation, supra,* 966 F.2d at 724 (citing *Public Service Mutual Insurance Company v. Levy,* 87 Misc.2d 924, 387 N.Y.S.2d 962, 965 (1976), *aff'd,* 57 A.D.2d 794, 395 N.Y.S.2d 1 (1977)).

### B. *Reasonable Good Faith Belief*

Burt maintains its otherwise untimely notice to Aetna on May 6, 1988 regarding an occurrence at the Pfohl Landfill is excusable as Burt held a reasonable good faith belief that it was not responsible for contamination at the Pfohl Landfill until the DEC's letter dated August 18, 1986 advised that Burt was considered a PRP with regard to the Pfohl Landfill.[14] Plaintiff's Reply Memorandum at 20–21. Aetna counters that this argument is defeated by the fact that Burt notified another insurer, Hartford Insurance Company, of the Pfohl occurrence in August 1986, and, in any event, that the court's determination in its previous Report and Recommendation that Burt was obliged to notify its insurance carriers of the occurrence accrued with Burt's receipt of the March 20, 1985 DEC letter to Burt is now the law of the case and must be followed on this motion. Defendant's Reply Memorandum at 4, 5 (citing Report and Recommendation filed August 2, 1994 (Docket Item No. 56) at 21).

> Under New York law,
>
> [a]n insured's failure to give timely notice to its insurer may be excused ... by proof that the insured either lacked knowledge of the occurrence or had a reasonable belief of non-liability.

*Olin Corp., supra,* 966 F.2d at 724 (citing *International Flavors & Fragrances, Inc., supra,* at 271).

Further,

> [t]he test for determining whether notice of occurrence must be given to a partic-

14. Burt does not assert this argument with regard to the Sleepy Hollow site.

ular insurer " 'is whether the circumstances known to the insured at that time would have suggested to a reasonable person the *possibility* of a claim [against that insurer].' "

*Ogden Corporation, supra,* at 43 (quoting *International Flavors & Fragrances, Inc., supra,* at 272) (italics added) (bracketed text in original).

At issue in *Ogden Corp.,* was whether notification to a polluter that its operation of a scrapyard over three decades had resulted in environmental problems triggered the polluter's obligation to notify all its insurance carriers for that time period of a potential claim. *Ogden Corp., supra.* The court held such notification of the situation sufficiently advised the polluter of the threat of litigation, requiring the polluter apprise its insurer of the occurrence. *Id.* Therefore, contrary to Burt's assertion, no formal PRP letter, summons or complaint is necessary to alert an insured of a potential environmental claim.

In the instant case, the March 20, 1985 DEC letter advised Burt that the Pfohl Landfill had been identified as an "inactive hazardous waste disposal site," that the Landfill was used for disposal of wastes, and that Burt had been identified as "a generator of wastes disposed of at this [Pfohl Landfill] site." Jacobson Affidavit, Ex. 4. The letter further requests Burt provide information regarding what wastes generated by Burt and deposited into the Landfill would be considered hazardous under relevant state or federal regulations. *Id.* Although the letter does not specifically advise that Burt is considered a PRP with regard to the Pfohl Landfill, that it seeks information to assist the DEC in

determining whether Burt is responsible for the contamination of the Landfill would suggest to a reasonable person the *possibility* of a claim.[15] Accordingly, Burt's argument that its untimely notice to Aetna regarding the Pfohl Landfill is excusable based on reasonable good faith belief that it was not liable for any potential legal claims until it received the DEC's letter of August 1986 formally advising that Burt was a PRP as to the Landfill is without merit. As a matter of law, no reasonable juror could, on the evidence presented, so find.

■ Alternatively, under the law of the case doctrine, a decision on an issue of law made at one stage of the case becomes binding precedent to be followed in subsequent stages of the same litigation. *Pescatore v. Pan American World Airways, Inc.,* 97 F.3d 1, 7–8 (2d Cir.1996); *In re PCH Associates,* 949 F.2d 585, 592 (2d Cir.1991). The purpose of law of the case rule is "to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." *Liona Corp., supra,* at 592 (quoting 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure, § 4478, at 788 (1981)). Therefore, the court's consideration of Burt's argument that it was not aware of its liability until August 1986 when the DEC formally advised that Burt was a PRP with regard to contamination at the Pfohl Landfill must be consistent with the findings contained in the August 2, 1994 Report and Recommendation where the court found the March 20, 1985 DEC letter sufficiently advised Burt of its potential liability as to the Pfohl site such that Burt was obligated to notify its insur-

---

**15.** The court notes that in 1985, this court was handling the major litigation arising from the notorious Love Canal site contamination problem and that CERCLA, 42 U.S.C. § 9601 *et seq.,* imposing strict and joint and several liability on generators and transporters of hazardous wastes and owners and operators of dump sites had been recently enacted in 1980. CERCLA also provides that a state agency may commence an action against gen-

erators and transporters of hazardous wastes and owners and operators of dumpsites, to recover monies expended to clean-up contaminated. 42 U.S.C. § 9607(f)(2)(B). Similar legislation in New York state was enacted in 1979. *See* N.Y.Envtl. Conserv.Law, § 27–1313.5.a (McKinney 1997), 1979 N.Y.Laws c. 282, § 9 (DEC may impose liability for remediation on polluters).

ers. Accordingly, Burt's reasonable good faith belief argument is not, as a matter of law, a valid excuse for its untimely notification of the occurrence at the Pfohl Landfill.

## C. *Lack of Knowledge of Existence of Coverage*

Burt maintains that its late notice to Aetna of occurrences at both the Pfohl Landfill and the Sleepy Hollow site is excusable based on its lack of knowledge of the Aetna insurance policies. Plaintiff's Reply Memorandum at 21–22. This argument has, however, been rejected by the Second Circuit as a matter of New York law. *Olin Corp., supra,* 966 F.2d at 724–25.

■ At issue in *Olin Corp.,* was whether lack of knowledge of the existence of an insurance policy excused the insured's delay in notifying the insurer of an occurrence for which coverage was sought. *Olin Corp., supra,* 966 F.2d at 724–25. The insured, a generator of hazardous waste, was first advised of its potential liability when it was sued in July 1979, but did not notify one of its liability insurance carriers until November 1981 when the insured first discovered the relevant insurance policies. *Id.* at 723–24. In holding such notification was untimely, the court distinguished "[a] justifiable lack of knowledge of coverage from a lack of knowledge of the existence of a policy." *Id.* at 724–25. Whereas the former is within the control of the insurer such that the insurer will "generally bear some of the responsibility for an insured's lack of knowledge of the coverage," the latter is within control of the insured. *Id.* (citing *Padavan v. Clemente,* 43 A.D.2d 729, 350 N.Y.S.2d 694, 696 (1973)). However, as to the existence of an insurance policy, it is the responsibility of the insured, rather than the insurer, to keep track of which carriers have provided it with liability insurance as an insurer has no control over an insured's retention of an insurance policy and, thus, should not bear responsibility for an insured's loss of a

policy, *Olin Corp.,* at 725, or any resulting lack of knowledge of the identity of its insurer.

■ In the instant case, Burt does not argue that it was unaware that any specific Aetna insurance policy provided coverage for the occurrences at the Pfohl Landfill and Sleepy Hollow site; rather, Burt argues that it was unaware that Aetna was one of its CGL insurance carriers for the relevant period covering such occurrences. This excuse is essentially identical to the one rejected by the Second Circuit. *Olin Corp., supra,* 966 F.2d at 724–25 (holding fact that insured did not locate policies issued for years 1954 and 1955 until 1981 did not excuse insured's late notification of 1979 occurrence). Burt's former status as a wholly-owned subsidiary of Moore underscores the unreasonableness of its failure to know (or, more accurately, its new owners' failure), who all of its insurers were during the period prior to its sale in 1983 as such information could have been developed, as a matter of due diligence with Moore, in connection with that transaction well prior to the 1985 DEC letter. The fact that Burt was able to successfully reconstruct the extent of its insurance coverage incident to the instant litigation demonstrates such information and, possibly, even more information on this subject matter, was available over 10 or 15 years earlier. Therefore, the court likewise rejects, as a matter of law, Burt's excuse of lack of awareness of the existence of the Aetna policies as a valid excuse for Burt's untimely notification of occurrences at the Pfohl Landfill and the Sleepy Hollow Site.

## D. *Disclaimer and Waiver*

As the court has found Burt's asserted excuses for untimely notification are without merit, as a matter of law, it now addresses whether Aetna has failed to timely assert such delayed notification as a ground for disclaiming coverage, thereby waiving it and obligating Aetna to provide coverage as to those claims despite Burt's unexcused untimely notification. Burt

maintains that Aetna has waived its right to deny coverage based on Burt's untimely notification by failing to timely disclaim and that Aetna is now estopped from asserting such defense with regard to the occurrences at the Pfohl Landfill and the Sleepy Hollow site, as well as the *Cline I* claim. Plaintiff's Reply Memorandum at 18–19. Aetna maintains that its disclaimer of coverage is not untimely as Aetna interposed a late notice defense in its original answer filed in this action on June 4, 1991. Defendant's Reply Memorandum at 13–14. Aetna asserts that, under New York law, prompt written notice of disclaimer based on late notice is not required with regard to cases alleging only property damage. *Id.* at 15–16. Aetna also maintains that it was not obligated, under New York law, to disclaim coverage as it disputed the existence of the claimed policies. *Id.* at 16–17. Finally, Aetna maintains Burt has not established requisite prejudice to support its estoppel argument. *Id.* 17–18.

Initially, Aetna argues that it was not obligated, under New York law, to disclaim as it disputed the very existence of the policies under which Burt seeks coverage. Defendant's Reply Memorandum at 16–17. However, the cases Aetna cites in support of this contention, including *Presbyterian Hospital in the City of New York v. Maryland Casualty Company*, 90 N.Y.2d 274, 660 N.Y.S.2d 536, 683 N.E.2d 1 (1997), *Central General Hospital v. Chubb Group of Insurance Companies*, 90 N.Y.2d 195, 659 N.Y.S.2d 246, 681 N.E.2d 413, 415 (1997), *Zappone v. Home Insurance Company*, 55 N.Y.2d 131, 447 N.Y.S.2d 911, 432 N.E.2d 783, 786 (1982), and *Albert J. Schiff Associates, Inc. v. Flack*, 51 N.Y.2d 692, 435 N.Y.S.2d 972, 417 N.E.2d 84, 88 (1980), are inapposite. A careful reading of those cases reveals that although they hold that failure to timely disclaim will not create coverage that is not otherwise provided for, they do not support the proposition that a dispute over whether an insurance policy was ever issued negates the putative insurer's obligation to disclaim based on untimely notice of an occurrence.

At issue in three of those cases was whether an insurer who sought to disclaim coverage on the basis that the relevant insurance policy did not provide for the coverage sought could waive such lack-of-coverage disclaimer by failing to promptly notify of its intention to disclaim. In particular, in *Central General Hospital, supra,* the Court of Appeals held that an automobile insurer's untimely disclaimer did not preclude the insurer from disclaiming liability where the claim that did not arise out of an insured incident. *Central General Hospital, supra,* at 415. In *Zappone, supra,* the Court of Appeals held that an insurer's failure to timely disclaim coverage for a personal injury claim filed as a result of an automobile accident pursuant to the predecessor statute to New York Insurance Law ("N.Y.Ins.Law") § 3240[d], did not preclude the insurer from later denying liability on the ground that the insurance policy did not cover the particular automobile involved in the accident. *Zappone, supra,* at 786. Also, in *Albert J. Schiff Associates, Inc., supra,* the Court of Appeals held that an insurer's disclaimer of liability based on specific exclusions within professional errors and omissions indemnity insurance policies issued to an insurance firm did not waive the insurer's later asserted defense that a claim brought against the firm by a competitor for willful and malicious usurpation of a trade or commercial secret was outside the scope of the policies as the defense of non-coverage is never waived by a failure to timely assert it. *Albert J. Schiff, Associates, Inc., supra,* at 88. At issue in the fourth case, *Presbyterian Hospital, supra,* was whether a no-fault insurer may be precluded from interposing a statutory exclusion defense in subsequent litigation by failing to deny the claim within 30 days as required under N.Y.Ins.Law § 5106(a). In *Presbyterian Hospital, supra,* the Court of Appeals held that the insurer, by failing to comply with the statutory disclaimer requirement, waived its right to disclaim on that ground. *Id.* at 4–5.

These cases demonstrate that under New York law, where a particular insurance policy never provided *coverage* for the type of incident for which the insured files a claim, the insurer does not waive the defense of non-coverage by failing to timely assert it. *Central General Hospital, supra,* at 415; *Zappone, supra,* at 786; and *Albert J. Schiff Associates, Inc., supra,* at 88. Where an insurance policy would provide for coverage, however, but for the insurer's invocation of a statutory defense to coverage, the insurer's failure to timely invoke such defense will result in a waiver of that ground for disclaimer. *Presbyterian Hospital, supra,* at 4–5. Thus, it does not follow that, under New York law, as Aetna asserts, where at issue is not whether a particular policy specifically provided for the *coverage sought* by the insured, but whether a particular policy *was ever issued,* an insurer is not required to timely disclaim. Such result is consistent with New York law which places the risk that coverage exists on the insurer, *see Gold Fields American, supra,* at 904–905, 661 N.Y.S.2d 948, as the possibility that the policy in dispute exists and, thus, that coverage also exists, should be on the insurer as well. Imposing the duty on the insurer to provide an early disclaimer based on late notice of an occurrence or claim, even where the insurer claims there is no policy, enables the insured to make a prompt and fully informed decision as to whether to pursue efforts to establish the existence of the policy or to better invest its resources on investigating the potential claim, and preparing a defense.

It is significant that Aetna has essentially conceded that if the court finds that the disputed policies were, indeed, issued, that such policies would have been their standard policies which contained the timely notification provisions. As such, Aetna cannot, and does not, assert that it was unaware of its duty to disclaim coverage. Moreover, it was Aetna's records retention "policy," which resulted in de-struction of occurrence based CGL policies only 10 or 15 years after being issued, that appears to be the main reason Aetna could not promptly verify potential coverage for Burt, thus requiring an immediate specific late notice disclaimer after first receiving notice from Burt. The court notes Aetna has not stated precisely when or how the policies were destroyed and, or even, whether its retention policy is consistent with industry standards. As such, the court finds that, on the record presented, Aetna had a duty to timely disclaim based on late notice of an occurrence. Further, as the court has found Burt sufficiently established the existence of the policies, this argument need not be addressed further.

Burt also maintains that Aetna first disclaimed based on untimely notification as to the Pfohl Landfill in its motion for summary judgment, filed on June 26, 1998, more than ten years after Burt notified Aetna of the occurrence at the Pfohl Landfill. Plaintiff's Reply Memorandum at 18. In reply, Aetna draws the court's attention to the fact that Aetna first asserted untimely notification as its second affirmative defense in its original answer filed in this action on June 4, 1991. Defendant's Reply Memorandum at 13 (citing Answer filed June 4, 1991 (Docket Item No. 3), attached as Ex. 29 to Mugel Affidavit in Opposition to Partial Summary Judgment (Docket Item No. 127)). Careful review of that affirmative defense demonstrates that Aetna did not specifically mention untimely notification of an occurrence as a ground for disclaimer but, instead, asserts that Burt failed to comply with the "conditions" of the insurance policy. Answer, filed June 4, 1991, Second Affirmative Defense. Further, even if Burt construed such "conditions" as referring to untimely disclosure, more than three years would have elapsed since Burt, on May 6, 1988, advised Aetna of the Pfohl occurrence.

The court, however, need not consider whether such disclaimer was timely with regard to the underlying

CERCLA actions based on occurrences at the Pfohl Landfill and Sleepy Hollow site, or the *Cline I* claim, as such occurrences and claim do not involve any death or bodily injury. Specifically, under New York law, provided an occurrence or claim does not involve death or bodily injury, even an untimely disclaimer of coverage will be given effect, unless the plaintiff can show prejudice as a result of unreasonable delay in disclaiming. *United States Fidelity and Guaranty Co. v. Weiri*, 265 A.D.2d 321, 696 N.Y.S.2d 200, 201 (1999) (citing *Incorporated Village of Pleasantville v. Calvert Ins. Co.*, 204 A.D.2d 689, 612 N.Y.S.2d 441, 443 (1994), and *Greater New York Savings Bank v. Travelers Insurance Company*, 173 A.D.2d 521, 570 N.Y.S.2d 122, 123 (1991)). "Mere delay in disclaiming coverage does not suffice to estop an insurer from disavowing liability." *Greater New York Savings Bank, supra*. The doctrine of estoppel does apply, however, where the insured demonstrates it has been prejudiced as a result of an unreasonable delay in failing to disclaim. *Greater New York Savings Bank, supra*, (citations omitted). To show prejudice, the insured must show reliance and a change in position resulting from the delay. *Airco Alloys Division, Airco Inc. v. Niagara Mohawk Power Corp.*, 76 A.D.2d 68, 430 N.Y.S.2d 179, 187 (1980).

Further, *Firemen's Fund Ins. Co. of Newark v. Hopkins*, 88 N.Y.2d 836, 644 N.Y.S.2d 481, 666 N.E.2d 1354 (1996), on which Burt relies in support of its waiver argument, is readily distinguishable from the instant case as *Hopkins, supra*, involved a personal injury claim and, thus, N.Y.Ins.Law § 3420(d) (McKinney 1985) ("§ 3420(d)"), requiring an insurer provide prompt written notification in bodily injury and death cases based on an "accident," applied. That the Court of Appeals in *Hopkins* relied on § 3420(d) is evident from the cases the court cited in support of its holding. *See Hartford Insurance Company v. County of Nassau*, 46 N.Y.2d 1028, 416 N.Y.S.2d 539, 389 N.E.2d 1061 (1979) (citing predecessor statute to § 3420(d), *i.e.*, N.Y. Insurance Law § 167 (McKinney 1939)); *Allstate Insurance Company v. Gross*, 27 N.Y.2d 263, 317 N.Y.S.2d 309, 265 N.E.2d 736 (1970) (same).

 Also, in this case, Burt points to nothing demonstrating it has been prejudiced as a result of Aetna's unreasonable delay in failing to disclaim. As such, even assuming, *arguendo*, that Aetna did fail to timely disclaim as to the CERCLA actions based on occurrences at the Pfohl Landfill and the Sleepy Hollow site, or the private property damage *Cline I* action, Aetna has not, as a matter of law, waived untimely notification as a defense to providing coverage for those claims.

### 6. Claims Allegedly Outside Terms of Policies or Relevant Coverage Periods and Allocation of Defense Costs

Aetna argues that summary judgment should be granted as to certain of Burt's claims which are outside either the terms of the policies or the periods of coverage. Defendant's Memorandum at 19; Defendant's Reply Memorandum at 20–21. Aetna also asserts that the court should allocate defense costs as between Burt and Aetna with regard to some of the private property damage and personal injury actions, namely *Cline I, Ewert, Bartlebaugh, Cline II, Marzec, Spink* and *Weigel*, as certain plaintiffs in those actions allege claims that are not covered under the Aetna policies. Defendant's Memorandum at 20; Defendant's Reply Memorandum at 23–27. Burt opposes each of these arguments. Plaintiff's Memorandum in Opposition to Partial Summary Judgment at 16–24.

 As discussed, whether an insurer has an obligation to defend is a question of law for the courts, *Freedom Gravel Products, supra*, at 279, and is derived from the allegations of the complaint and the terms of the policy. *Technicon Electronics Corp., supra*, at 1050. An insured's duty to defend is generally

determined based on a comparison of the allegations within the four corners of the complaint with the coverage provisions of the relevant insurance policies. *Avondale Industries, supra,* at 1425; *Frontier Insulation Contractors, Inc, supra,* at 868. A liability insurer is obligated to defend its insured against suit even if facts outside the four corners of the underlying pleadings indicate the claim is meritless or not covered. *Fitzpatrick v. American Honda Motor Co.,* 78 N.Y.2d 61, 571 N.Y.S.2d 672, 575 N.E.2d 90 (1991). *See also Seaboard Surety Co., supra,* at 275 ("The duty to defend arises whenever the allegations in a complaint against the insured fall within the scope of the risks undertaken by the insurer, regardless of how false or groundless those allegations might be."). In other words, the duty to defend is not contingent on the likelihood that the insurer will ultimately be required to indemnify the insured. *Seaboard Surety Co., supra.*

 The insurer's duty to defend exists even if the complaint filed against the insured asserts additional claims falling outside the policy's coverage or within an exclusionary provision. *Id.* However, once it can be determined, as a matter of law, that the insurer would not, upon trial on the action, be required to indemnify the insured as to a particular claim, the insurer is relieved of its duty to defend that claim. *Avondale Industries, supra,* 774 F.Supp. at 1424 (citing *Allstate Ins. Co. v. Zuk,* 78 N.Y.2d 41, 571 N.Y.S.2d 429, 574 N.E.2d 1035, 1037 (1991)) ("an insurer can be relieved of its duty to defend if it establishes as a matter of law that there is no possible factual or legal basis on which it might eventually be obligated to indemnify its insured under any policy provision."). In other words,

> '[t]he insurer's duty to defend is . . . not an interminable one, and will end if and when it is shown unequivocally that the damages alleged would not be covered by the policy.' *Sturges Manufacturing Co. v. Utica Mutual Ins., Co.,* 37 N.Y.2d 69, 371 N.Y.S.2d 444, 332 N.E.2d 319,

322 (1975). Thus, where a court can determine conclusively that there is no genuine dispute as to an extrinsic fact which when applied to the underlying allegations limits them to a claim not covered by the policy, the insurer no longer need defend. In making such a determination, the court may thus, in exceptional circumstances, look outside the four corners of the complaint to consider whether extrinsic evidence establishes to a certainty that the insurer faces no liability for indemnity.

*Avondale Industries, supra,* at 1424.

 Nevertheless, the insurer remains liable for the defense costs incurred in defending the claims asserted in the underlying action until a judicial determination that it is not required to defend such claims. *Id.* at 1427 (citing *Burroughs Wellcome Co., supra,* at 1220). The court examines Aetna's challenges to the individual private party actions in accordance with the relevant law.

### A. *Freier Action*

Aetna maintains that although the complaint filed in the *Freier* action alleges the plaintiffs' properties were damaged by hazardous waste leaking from the Pfohl Landfill, the *Freier* plaintiffs did not come into possession of their properties until 1974, after the expiration of all the relevant policies and, thus, it is impossible that any of the *Freier* plaintiffs could have suffered the alleged property damage within the period of coverage provided by the policies. Defendant's Memorandum at 20–21; Defendant's Memorandum in Opposition to Summary Judgment at 20–21; Defendant's Reply Memorandum at 21–22. As such, Aetna maintains that it has no duty to defend the *Freier* action. *Id.*

As stated, standard CGL policies commonly issued by Aetna during the period 1955 through 1965 provide "[t]his policy applies only to accidents which occur during the policy period within the United States of America, its territories or posses-

sions, or Canada." Kelley Affidavit, Ex. A at 2; Mugel Affidavit, Ex. 59 at 2. Similarly, standard CGL policies commonly issued by Aetna during the period 1966 through 1971 provide "[t]his insurance applies only to bodily injury or property damage which occurs during the period within the policy territory." Kelley Affidavit, Ex. B at 7; Mugel Affidavit, Ex. 61 at 7. "Occurrence" is defined in the latter policy as

> an accident, including injurious exposure to conditions, which results during the policy period, in bodily injury or property damage, neither expected nor intended from the standpoint of the insured.

Kelley Affidavit, Ex. B at 13; Mugel Affidavit, Ex. 61 at 13.

Thus, for Aetna to avoid having to defend the *Freier* action, the court must determine whether Aetna has conclusively demonstrated that the damage to the property acquired by the Freier plaintiffs in 1974, does not qualify as an occurrence during the policy period of any of the Aetna policies.

■■■ In support, Aetna relies on *Avondale Industries, supra,* 774 F.Supp. at 1424–27. The relevant facts of *Avondale Industries* are, however, readily distinguishable from the instant case. In particular, *Avondale Industries* was a declaratory judgment action brought by an insured who had been identified as a PRP based on its generation of hazardous waste oil that, beginning in 1975, was dumped at a site later declared by the EPA as a hazardous waste site. The defendant insurer, who issued the first of several consecutive insurance policies to the plaintiff in 1975, commenced a third-party action seeking contribution from third party defendants, other insurers who had issued insurance policies to the plaintiff prior to 1975. The court, upon considering extrinsic evidence, determined that the defendant would, at trial, be unable to prove that the plaintiff commenced shipping its hazardous waste oil to the site prior to 1975. Accordingly, as to one third-party defendant which issued an insurance policy insuring the plaintiff through the first half of the year 1975, the year the plaintiff began shipping its waste oil to the contaminated site, the court found that a genuine issue of material fact existed as to whether any of the plaintiff's shipments were covered under that insurance policy. However, in *Avondale Industries,* the court also found that extrinsic evidence established, as a matter of law, that the most recent insurance policies issued to the plaintiff by two other third-party defendants provided coverage only through 1972. Thus, the defendant would be unable to meet its burden on summary judgment, as the party attempting to invoke coverage, of proving that any of the plaintiff's waste oil was transported to the site during the period of coverage under the insurance policies issued by those third-party defendants and, as such, those third-party defendants were not required to contribute to any judgment the plaintiff recovered against the defendant. *Id.* at 1426–27. Simply put, with regard to occurrence based CGL policies, insurers can never be required to indemnify plaintiffs suing in private actions for personal injuries and property damage attributable to hazardous waste generated by a polluter and deposited into the subject hazardous waste site *after* the relevant insurance policies expire because such claims conclusively are not within the policy's definition of an occurrence.

In contrast, in the instant case, Aetna seeks to avoid coverage based on the fact that the *Freier* plaintiffs did not acquire their property until after the expiration of the insurance policies Aetna issued. However, the definition of occurrence does not include the making of a claim within the coverage period and the applicable caselaw demonstrates that the coverage issue before this court is not when any allegedly damaged property was acquired by the *Freier* plaintiffs but, rather, whether Burt's hazardous waste was deposited into the Pfohl Landfill during a period in which Aetna had provided coverage, which waste is the basis of liability alleged later by the

plaintiff. *Avondale Industries, supra*, at 1427. Specifically, New York law provides that property damage occurs, and insurance coverage is triggered based on such occurrence, when the hazardous substance is first placed on the property. *See Stonewall Insurance Company v. Asbestos Claims Management Corporation*, 73 F.3d 1178 (2d Cir.1995) (determining, under New York law, that property damage based on materials containing asbestos occurred when such materials were installed into buildings, triggering only CGL policies in effect at that time); *Asbestos Claims Management Corp., supra*, at 1209 (citing *Maryland Casualty Company v. W.R. Grace and Company*, 23 F.3d 617, 627 (2d Cir.1993) ("[I]nstallation of asbestos is an occurrence of damage-in-fact and triggers insurance coverage in effect at that time.")).[16]

▮ Thus, the occurrence or accident to which Aetna's CGL coverage in the instant policies applies is the act of depositing, *i.e.*, disposal of, Burt's wastes at the Pfohl Landfill during the coverage period, not when a claimant accrues a cause of action by suffering an alleged loss. Here, however, genuine issues of material fact exist as to when the hazardous waste generated by Burt and transported to and deposited into the Pfohl Landfill leached out of the Landfill onto the property acquired in 1974 by the *Freier* plaintiffs. It is not unreasonable to suppose that the trier of fact may find, based on the evidence at trial, that such leaching, and thus resulting property damage, occurred during the time Burt was insured against such occurrences through the insurance policies issued by Aetna. Accordingly, the court finds that, as a matter of law, although the *Freier* plaintiffs did not acquire their properties until 1974, after the expiration of the relevant insurance policies, Aetna has a

duty to defend that action based on its CGL policies in effect when hazardous waste generated by Burt was allegedly deposited into the Pfohl Landfill and, subject to the evidence, may have resulted in property damage, although whether Aetna must indemnify Burt on this claim must await trial.

### B. *Moore Action*

Aetna maintains that as the *Moore* plaintiffs seek only injunctive relief for the establishment of a fund for future medical testing and surveillance based on exposure to the Pfohl Landfill, the *Moore* action does not seek damages for "bodily injury" within the meaning of the Aetna CGL policies. Defendant's Memorandum at 11–13; 21; Defendant's Reply Memorandum at 22–23. Burt argues in opposition that insofar as the *Moore* action seeks compensatory damages for money already expended by its plaintiffs for medical examinations, it alleged "damages because of bodily injury, sickness or disease" within the meaning of the Aetna policies. Plaintiff's Memorandum of Law in Opposition to Partial Summary Judgment at 21. Neither party cites any authority in support of its position and the court's research reveals no case on point.

▮ The allegations of a complaint are to be "liberally construed" in determining whether they are within the coverage of an insurance policy. *Ruder & Finn Incorporated v. Seaboard Surety Company*, 52 N.Y.2d 663, 439 N.Y.S.2d 858, 422 N.E.2d 518, 521 (1981) ("If, liberally construed, the claim is within the embrace of the policy, the insurer must come forward to defend its insured no matter how groundless, false or baseless the suit may be") (citing *International Paper Co. v. Continental Cas. Co.*, 35 N.Y.2d 322, 361 N.Y.S.2d 873, 320

16. Insofar as Aetna urges the court to reject the "injury in fact" rule on the basis that the rule has been rejected by other courts, Defendant's Reply Memorandum at 23, the court observes that as those other courts are within neither New York or the Second Circuit they

are not controlling precedent for the instant case; nor did they apply New York law. *See Browder v. United States Fidelity & Guaranty Company*, 893 P.2d 132 (1995), and *Hoppy's Oil Service Inc. v. Ins. Co. of North America*, 783 F.Supp. 1505 (D.Mass.1992).

N.E.2d 619, 621 (1974); *Lionel Freedman, Inc. v. Glens Falls Insurance Company,* 27 N.Y.2d 364, 318 N.Y.S.2d 303, 267 N.E.2d 93, 94 (1971); *Goldberg v. Lumber Mut. Casualty Ins. Co. of N.Y.,* 297 N.Y. 148, 77 N.E.2d 131, 133–34 (1948)). The requirement that the complaint be liberally construed is based on the well-established legal principle that the duty of an insurer to defend is broader than its duty to indemnify, *Ruder, supra,* at 521 (citing *Goldberg, supra,* at 133), as well as the principle that an insurer's duty to defend does not depend on the likelihood of the insured's ultimate liability. *Ruder, supra,* at 521. Liberal construction favoring the insurer's duty to defend also protects the insured against poorly or incompletely pleaded cases. *Id.*

■ In this case, the *Moore* complaint, liberally construed, can be said to allege claims for bodily injury or property damage. It does not strain credulity to construe the *Moore* plaintiffs' allegation that they are at a higher risk for developing certain cancers as a bodily injury as, if true, such allegation is predicated on the plaintiff's diminished physical ability to resist such illnesses. The court, therefore, finds that the *Moore* complaint, liberally construed as it must be, alleges claims for bodily injury within the meaning of the CGL policies, requiring, as a matter of law, Aetna to defend such action.

## C. *Allocation of Defense Costs*

Aetna also asserts it has no duty to defend portions of other private property damage and personal injury actions for various reasons and, in the event the court has determined that Burt established the existence of the disputed policies, requests the court allocate the defense costs between Burt and Aetna with respect to the challenged portions of those actions namely *Cline I, Ewert, Bartlebaugh, Cline II, Marzec, Spink* and *Weigel,* as certain plaintiffs in those actions assert claims that Aetna contends are not covered under the Aetna policies. Defendant's Memoran-

dum at 20; Defendant's Reply Memorandum at 23–27. Preliminarily, Aetna maintains it is not required to defend the *Cline I* property damage action as the plaintiffs in that case did not come into possession of their respective properties until after the expiration date of the most relevant policies. Defendant's Memorandum at 21–22; Defendant's Reply Memorandum at 23. The court, however, has found that Aetna is not obligated to provide any defense or indemnification with regard to the *Cline I* property damage action based on Burt's failure to timely notify Aetna of the claim. Discussion, *supra,* at 631–634. Further consideration of this issue is thus unnecessary.

Aetna argues it is not obligated to defend allegations in the *Marzec* property damage action pertaining to plaintiff Wolford who did not acquire the relevant property until after the Aetna policies expired. Defendant's Memorandum at 22; Defendant's Reply Memorandum at 23. As discussed above, however, when any plaintiff acquired a particular piece of property is irrelevant to whether a property damage claim as alleged in this litigation is covered under an insurance policy as the relevant insurance policy is not the one in effect when contaminated property is purchased; rather, the relevant policy is the one in effect when the hazardous waste was deposited, and the claimed property damage resulted, thus constituting the covered occurrence or accident alleged to result in damage. *Discussion, supra,* at 635–637. Aetna, therefore, has a duty to defend this claim.

Aetna asserts it has no duty to defend the claim of *Bartlebaugh* plaintiff Slavinski who allegedly purchased her property during the coverage period, but *after* Aetna began incorporating the pollution exclusion into its policies. Defendant's Memorandum at 22; Defendant's Reply Memorandum at 23. However, as this court has found Aetna failed to sufficiently demonstrate that any of the policies issued to Moore were endorsed by the pollution exclusion, Discussion, *supra,* at 46–51, Aetna

may not rely on such exclusion to avoid coverage as to Slavinski's claim.

Aetna asserts it is not obligated to defend against the loss of consortium claims contained in the *Ewert, Spink* and *Weigel* actions because such claims accrued long after the relevant policies expired. Defendant's Memorandum at 23–24; Defendant's Reply Memorandum at 25–27. Specifically, Aetna maintains that as the respective spouses' illnesses in those actions were not diagnosed during the pertinent coverage period, the loss of consortium claims also did not accrue until after the coverage period. *Id.* Burt argues in opposition that Aetna's duty to defend against such derivative actions arises at the time of such exposure from which the underlying claims arise and cites *Burroughs Wellcome Co., supra,* at 1221–22, in support. Plaintiff's Memorandum in Opposition to Partial Summary Judgment at 22–23. In reply, Aetna maintains *Burroughs Wellcome Co., supra,* is inapposite. Defendant's Reply Memorandum at 25. However, a careful reading of *Burroughs Wellcome Co., supra,* reveals the court did not consider the viability of the loss of consortium claims based on the deceased spouses' conscious pain and suffering occurring after the expiration date of coverage and, thus, did not apply controlling New York law.

▮ In *Liff v. Schildkrout,* 49 N.Y.2d 622, 427 N.Y.S.2d 746, 404 N.E.2d 1288 (1980), the Court of Appeals held that a cause of action for loss of consortium lies only insofar as a surviving spouse seeks to recover for the period prior to death of the marital partner; however, a loss of consortium claim is also derivative of an action for the marital partner's conscious pain and suffering. *Liff, supra,* at 1291. Therefore, where the later deceased marital partner did not endure conscious pain and suffering during the coverage period, no derivative loss of consortium claim can be asserted for such coverage period on behalf of the surviving spouse.

▮ In this case, Aetna has submitted evidence in the form of the written responses to interrogatories and deposition testimony by plaintiffs asserting loss of consortium claims which conclusively establishes that the deceased spouses for whom the loss of consortium claims are asserted by the surviving spouses did not experience conscious pain and suffering based on their cancers until after all the Aetna policies had expired. *See* Jacobson Affidavit, Ex. 14 at 5 (establishing deceased spouse for whom loss of consortium claim is asserted in *Ewert* first became ill will cancer in 1988), Exs. 19 at 8 and 20 at 10 (establishing the two deceased spouses for whom loss of consortium claims are asserted in *Spink* first became ill in 1993 and 1995), and Exs. 21 at 7 and 22 at 8 (establishing both of the two deceased spouses for whom loss of consortium claims are asserted in *Weigel* first became ill in 1997). As such, Aetna has conclusively established, as a matter of law, that it will not be required to indemnify Burt as to these loss of consortium claims and, therefore, Aetna also is not required to defend Burt as to such claims. *Avondale Industries, supra,* 774 F.Supp. at 1424.

Aetna maintains that one of the plaintiffs seeking damages for bodily injury in the *Ewert* action, *i.e.,* Rosemary Spork, did not reside in the Pfohl site area during the alleged policy period and, as such, could not have contracted her illness during the relevant coverage period thus not qualifying as a covered occurrence. Defendant's Memorandum at 22; Defendant's Reply Memorandum at 23–24.[17] Aetna also maintains that David M. Wagner, a *Cline II*

---

17. Aetna makes the same assertion with regard to *Cline II* plaintiff Thomas Cline. Defendant's Memorandum at 22–23; Defendant's Reply Memorandum at 24. Burt maintains that a question of fact exists regarding whether Thomas Cline claims exposure during the coverage period. Burt's Memorandum in Opposition to Partial Summary Judgment at 22. However, this issue is now moot the *Cline II* action has since been discontinued as to Thomas Cline. Jacobson Affidavit, Ex. 15.

plaintiff, allegedly suffered personal injury based on exposure to toxins in the Pfohl Landfill after the covered period. Defendant's Memorandum at 10; Defendant's Reply Memorandum at 24. In support of such assertions, Aetna submits copies of answers given by Spork and Wagner to Aetna's interrogatories. *See* Jacobson Affidavit, Exs. 13 (interrogatory response in which Spork states she was exposed to toxic substances in the Pfohl Landfill while she resided near the Landfill during the years 1954 to 1962), and 16 (interrogatory response in which Wagner states he was exposed to the Pfohl Landfill while working near there between 1977 and 1981). As Aetna has conclusively shown that the personal injury claims asserted by both Spork and Wagner cannot be attributed to the period during which Aetna provided Burt with coverage through CGL policies issued to Moore, Aetna has no duty to indemnify Burt should Spork or Wagner ultimately succeed on their claims. Also, as Aetna cannot be required to indemnify Burt for these personal injury claims, it is also not required to defend Burt against it. *Avondale Industries, supra,* at 1424.

■ Insofar as Aetna seeks a declaration that it is has no duty to defend those *portions* of claims which it maintains are outside the coverage period, the court has found that an insurer's duty to defend a claim continues until it is conclusively established, as a matter of law, that the insurer can never be obliged to indemnify the insured as to that claim. *See* Discussion, *supra,* at 635. Thus, there is no need to apportion any defense costs between Aetna and Burt as to those personal injury claims for which the court has found Aetna has conclusively established, as a matter of law, are not covered under any policy it issued. However, insofar as Aetna's request can be interpreted as seeking an apportionment of the defense costs between Aetna and Burt as to those claims which are ultimately determined after trial to be outside the relevant policies' coverage, the court finds it is without authority to do so under controlling New York law.

Aetna cites several cases in which courts have apportioned defense costs as to covered and non-covered claims between the insurer and the insured. *See EMI Catalogue Partnership v. CBS/Fox Co.,* 1994 U.S.Dist. LEXIS 10441 at *8–9, 1994 WL 406149 at *3–4 (S.D.N.Y.1994); *Budd Company v. Travelers Indemnity Company,* 820 F.2d 787, 791 (6th Cir.1987); *Health–Chem Corp. v. National Union Fire Insurance Company of Pittsburgh, PA.,* 148 Misc.2d 187, 559 N.Y.S.2d 435 (1990). These cases are, however, distinguishable.

The facts of three of these cases demonstrate they involved unusual circumstances in which the insurer defended legal actions against the insured for which the relevant policies provided coverage for only a small portion of the claims asserted in the actions. In *Budd Co.,* the court relied on *Insurance Co. of North America v. Forty–Eight Insulations, Inc.,* 633 F.2d 1212 (6th Cir.1980), *modified,* 657 F.2d 814 (6th Cir.), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981). This is significant as in *Forty–Eight Insulations, supra,* the court's decision to allocate costs resulted from the fact that the defendant manufacturer was self-insured for certain periods in time during which it incurred liability for asbestosis and the court refused to allow the insured to reap the benefits of a free defense when the underlying liability clearly fell outside the scope of the policy coverage. *Forty–Eight Insulations, supra,* at 1224–25. The plaintiff in *Budd Co.* only had insurance for one year out of the relevant 20 year period. *Budd Co., supra,* at 790. The insurance coverage at issue in *Health–Chem. Corp.,* was a corporate director and officer liability policy which provided for payment of defense costs with respect to only those claims limited to where a director or officer was entitled to indemnification. *Health–Chem. Corp., supra,* at 436. Finally, *EMI Catalogue Partnership, supra,* was later vacat-

ed and, thus, is not a proper precedent on which to rely. *EMI Catalogue Partnership v. CBS/Fox Co.,* 1994 WL 512359 (S.D.N.Y.1004). Accordingly, none of these cases supports Aetna's contention that principles of equity and fairness require the requested apportionment of defense costs in this case.

### SUMMARY

In summary, Burt is entitled to summary judgment finding Aetna issued to Moore Comprehensive General Liability policies which also covered Burt, including policy Nos. 01AL26334CM(Y), providing coverage for the period December 31, 1963 through December 31, 1965, 01AL042774CM(Y) providing coverage for the period December 31, 1965 through December 31, 1967, and 01AL143628CM(Y), providing coverage for the period December 31, 1967 through December 31, 1971. Burt is also entitled to summary judgment finding that Aetna has failed to establish policy No. 01AL143268CM(Y) was endorsed by a pollution exclusion. Aetna is entitled to summary judgment that it is not required to defend Burt with regard to the CERCLA actions relevant to the Pfohl Landfill or the Sleepy Hollow site, or the *Cline I* property damage action as Burt failed to timely notify Aetna as to the relevant occurrences and claims, thereby failing to meet a condition precedent to suit. Aetna is, however, required to defend Burt with regard to the CERCLA actions relevant to the Alltift Landfill and the Booth Oil Site, as well as all the private personal injury and property damage actions except *Cline I.* Aetna is not required to indemnify Burt as to any claim outside the coverage of the policies, including the loss of consortium claims asserted in the *Ewert, Spink* and *Weigel* actions, or to *Ewert* plaintiff Rosemary Spork or *Cline II* plaintiff Wagner, nor must Aetna provide a defense as to those claims. Finally, in the absence of any controlling precedent supporting Aetna's request for apportionment of defense costs, the court will not order that defense costs ultimately be apportioned between Burt and Aetna as to claims that are ultimately found to be outside the coverage period or insurance policies.

### CONCLUSION

Based on the foregoing, Defendant's motion for partial summary judgment (Docket Item No. 120) is GRANTED in part and DENIED in part; Plaintiff's motion for summary judgment (Docket Item No. 135) is GRANTED in part and DENIED in part.

SO ORDERED.